People of the State of Illinois, Plaintiff-Appellee, v. Arthur Stringer and Richard Taylor, Defendants-Appellants.

Gen. Nos. 52,944, 52,945. (Consolidated.)

First District, Second Division.

February 24, 1970.

Rehearing denied November 5, 1970.

 

Howard T. Savage, of Chicago, for appellants.

Edward V. Hanrahan, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Assistant State's Attorney, of counsel), for appellee.

MR. JUSTICE BURKE delivered the opinion of the court.

Defendants were found guilty by a jury of the crimes of murder and robbery; each was sentenced to a term of fifty years to one hundred years in the penitentiary. They appeal.

Shortly after 5:00 on the morning of July 16, 1966, Henry Dority, the operator of a newspaper stand located at the corner of 53rd Street and Indiana Avenue in Chicago, was robbed and shot to death near the newsstand by two men who fled the scene. Several months later two persons who allegedly witnessed the incident identified the defendants as the perpetrators of the crimes by means of police photographs.

On November 14, 1966, the defendants, who were in custody at the Cook County Jail awaiting trial on indictments unrelated to the instant case, were transported to

the Cook County State's Attorney's Office in the Criminal Courts Building where they were shown in a lineup, again identified as the offenders, and subsequently indicted for the crimes. After the lineup had been concluded and in response to a comment made by one of the police officers assigned to the defendants, Stringer allegedly admitted shooting Dority; Stringer then allegedly asked Taylor how much money they got in the robbery, but Taylor stood mute.

Pretrial motions were filed by the defendants, consisting of a motion to suppress the oral statement allegedly made by Stringer, a motion for a severance of the trials, and a motion to suppress the identification testimony of the witnesses who identified the defendants at the November 14th lineup. After hearings, the trial court ruled inadmissible the portion of Stringer's statement relating to Taylor and denied all motions.

At the hearing on the motion to suppress the Stringer statement, Police Officer John Fitzgerald testified that the defendants were brought to the Criminal Courts Building for the purpose of being shown in a lineup in connection with the robbery and murder of Dority. He testified that the defendants were fully advised of their constitutional rights when they were placed in his and his partner's custody, but that the defendants responded only by shouting and demanding that they not be shown in a lineup but that they be returned to County Jail.

After the lineup had been concluded, in which the two defendants and four other men were shown, Officer Fitzgerald and his partner, Officer Joseph Marin, returned to the room where the defendants were being held and informed them that they had been identified in connection with the murder and robbery. Officer Fitzgerald testified that Stringer thereupon shouted, "Okay, okay, I killed him, let's get it over with." The officer stated that he then inquired of Stringer as to

the type of weapon which was used and that Stringer told him it was a .32 automatic pistol which he thereafter left with a friend. After Stringer declined to divulge the friend's name, the officer testified, he asked Stringer how much money was taken in the robbery. Stringer thereupon turned to Taylor and asked, "How much did we get?" but Taylor did not answer. Stringer stated that he was willing to give a written statement concerning the incident, but refused to do so when assistant state's attorney Thomas Hett was later brought into the room.

Officer Fitzgerald further testified that, prior to showing the defendants in the lineup, he was aware indictments were pending against both defendants for other crimes and that he at no time made an attempt to contact the defendants' attorney who was of record in those matters. He also stated that he did not seek permission from the defendants, their attorney of record in those other matters, or any court to have the defendants brought from the County Jail to the Criminal Courts Building.

Officer Marin substantially corroborated the testimony given by Officer Fitzgerald and likewise testified that the defendants were advised of their constitutional rights prior to being shown in the lineup and also that Stringer made the statement related by Officer Fitzgerald.

Defendant Stringer testified at the hearing on the motion to suppress the statement that he had been arrested and indicted in September 1966 on robbery charges and was represented by counsel with respect thereto. He testified that on November 14, 1966, he was taken from the County Jail, under the pretext that he was being released on bond, and was transported, with defendant Taylor, to the Criminal Courts Building. He further testified that Officer Fitzgerald told him that he and Taylor were to be placed in a lineup to determine if they could be identified in connection with

256

a murder. He stated that he demanded to see his attorney, but was refused, and that he was given no constitutional warnings prior to appearing in the lineup.

Stringer also testified that immediately prior to appearing in the lineup, he and Taylor were seated in a small room and he noticed two persons peer into the room from the outside; he stated that he later saw the same two persons viewing the lineup. (The two persons referred to by Stringer were Perry Smith, a People's witness at trial, and Carl Dunbar, a defense witness at trial.) Stringer testified that at the conclusion of the lineup, he and Taylor remained in the room with Officer Fitzgerald and several bailiffs, and Officer Fitzgerald informed the defendants that they had been identified in connection with the Dority murder.

Assistant state's attorney Thomas Hett testified that he had been summoned to the room where the defendants were being held and that he asked them if they wished to make a statement; Stringer refused. He further stated that neither defendant complained to him at that time that he had been threatened or intimidated; they wished only to be taken back to County Jail. He also testified that he did not recall either defendant state that he had been denied his rights.

At the hearing to suppress the identification testimony of the witnesses, assistant state's attorney Louis Garippo testified that he authorized the removal of the defendants from County Jail to the Criminal Courts Building to have them appear in the lineup. He stated that he did not seek the permission of the defendants, an attorney or a court to effect that removal.

Defendant Stringer testified and again related that he and Taylor were removed from the County Jail to the Criminal Courts Building. Prior to appearing in the lineup when he and Taylor were seated in a small room handcuffed to chairs, he noticed Smith and Dunbar peer

257

into the room at him and Taylor; he saw both men later viewing the lineup.

Stringer testified that he and Taylor were placed in the lineup with four other men. He testified that the heights of the four other men ranged from five feet, seven inches to five feet, eleven inches, and that their clothing was dirty and in disarray, whereas he and Taylor were taller and were more neatly dressed. Stringer also stated that he was asked his name during the lineup, but refused to give it. He testified that he wore eyeglasses during the lineup, that he was not certain whether Taylor wore eyeglasses, and that the four other men were not wearing eyeglasses.

Perry Smith testified that he viewed the November 14th lineup at the Criminal Courts Building, at which time he identified the defendants as the persons he observed shoot Dority. He testified that there were six men in the lineup, whose heights ranged from about five feet, four inches to five feet, nine inches. He stated that prior to viewing the lineup he had identified both defendants from photographs shown to him by the police, and again saw the photographs later at police headquarters.

Smith denied having told anyone that he had seen the two defendants in the small room in the Criminal Courts Building prior to the lineup. He further denied telling anyone of having identified Taylor's photograph at police headquarters, rather than at the same time as he identified Stringer's.

An assistant state's attorney, John McGarry, testified that he had been an assistant public defender and was assigned to represent the defendants in this case. He stated that in the course of his investigation of the matter, he had occasion to speak with Smith at his home. The witness identified a statement which he said he took from Smith, which was reduced to writing by himself, and corrected and signed by Smith. He re-

258

lated that Smith told him that he saw the two defendants seated in a small room in the Criminal Courts Building immediately prior to viewing the lineup. McGarry also testified that he was told by Smith that Smith did not identify Taylor's photograph until he was at police headquarters.

Carl Dunbar testified that he also attended the November 14th lineup. He testified that prior to that time he had viewed approximately ten photographs shown to him by police and that he picked out a picture of Taylor, but was unable to identify Stringer from the photographs. Dunbar testified that immediately prior to viewing the lineup, he and Smith observed the backs of the defendants who were seated in a small room, at which time the police informed him and Smith who the defendants were. He further testified that he observed both defendants in the lineup, and that he identified Taylor as resembling one of the men he saw fleeing the murder scene. He further stated that most of the men in the lineup were short and that most of them had "civilian type" haircuts, whereas the defendants were six feet tall and had "military type" haircuts.

At trial, Chicago Police Officer Michele Boynes testified that shortly after 5:00 a. m. on July 16, 1966, he received a radio communication to investigate a shooting at 53rd Street and Indiana Avenue. When he arrived at the scene, he discovered Dority's body lying on 53rd Street, about fifty feet west of Indiana Avenue. He testified that he had conversations with several persons in the area, none of whom were Smith or Dunbar, but he was unable to recall any description given of the assailants, other than one of the men wore dark pants and both men were about five feet, eight inches tall.

Perry Smith testified for the People and stated that he had performed catering work in a north suburb of

259

Chicago until approximately 2:00 a. m. on July 16th, after which he was driven to the south side of the city in a friend's automobile. Smith testified that he resided in the 5200 block of South Michigan Avenue and was dropped off by his friend near the Chicago Transit Authority elevated train station at 51st Street around 5:00 a. m. The witness testified that he proceeded on foot along 51st Street to Indiana Avenue where he turned south and walked along Indiana to 53rd Street.

Smith testified that the deceased operated a newspaper stand on the corner of 53rd and Indiana, and as he approached the corner he heard an argument in progress and heard Dority, whose voice he knew, shouting, "Holdup, holdup, holdup, they are robbing me, they are robbing me." Smith testified that he stopped and observed the scene, and then saw Dority chasing the two defendants along 53rd Street toward Michigan Avenue. Smith further testified that after the three men had run a short distance, he observed Taylor turn and fire a shot at Dority, after which Dority fell to the street. Smith stated that he then left the scene in order to keep out of the line of fire.

Smith gave a detailed description of the wearing apparel of the defendants on the morning of the incident. He further testified that he recalled seeing Stringer in the area of 47th Street prior to the shooting, but later testified that it was Taylor whom he remembered from the area and pointed Taylor out from the two defendants. Smith also testified that he identified both defendants from photographs and identified them thereafter in a lineup. Concerning the lineup, Smith related that the defendants were neatly dressed, whereas the other four men were dirty, looked like "whiskey heads or something," and were also shorter than, and wore their hair different from the defendants.

Officer Fitzgerald testified that he presented the defendants in a lineup on November 14, 1966. He stated that after the lineup had been concluded he informed the defendants that they had been identified in connection with the Dority murder, in response to which Stringer stated, "Okay, okay, I killed him. Let's get it over with." The officer also testified that Stringer at that time further related that he used a .32 automatic pistol in the slaying.

Officer Marin's testimony was substantially the same as Officer Fitzgerald's. In addition, Officer Marin testified that neither Smith nor Dunbar were taken past the room where the defendants were being held immediately prior to the lineup.

Defendants raised the defense of alibi. The mothers of the defendants each testified that her son was home in bed at the time of the murder.

Carl Dunbar was called as a witness for the defense. He testified that he and two other men were fixing a tire on his automobile in the alley between Indiana and Michigan Avenues, a short distance from 53rd Street, when he heard a gunshot and observed two men run past the mouth of the alley, one of them stating, "Come on, come on, I got it." He testified that one of the two men whom he was with in the alley later described a suspect to the police and identified him when the police returned with the suspect thereafter; the suspect was later released.

Dunbar further testified that he had previously identified Taylor from police photographs as resembling one of the men he observed run past the alley, and that he also told the police that Stringer "was possibly" the other man. Dunbar stated that at the time of trial, he did not know whether the defendants were the two men he observed run past the alley on the morning in question.

John McGarry testified at the trial and related the same account concerning the statement which he had

261

taken from Perry Smith as he did at the hearing on the motion to suppress the identification testimony of the witnesses. He further stated that Smith, at all times, maintained that he was able to identify the defendants as the men he observed shoot Dority.

Defendants first contend that the identification testimony is so weak, unsatisfactory and vague that it did not establish them as the persons who committed the offenses charged in the indictment.

 The testimony of a single witness, where positive and the witness credible, is sufficient to sustain a conviction, although that testimony may be contradicted. People v. Cox, 22 Ill2d 534, 177 NE2d 211. The adequacy of an identification raises a question of credibility for determination by the trier of fact. People v. Jackson, 28 Ill2d 566, 192 NE2d 873.

The testimony of Perry Smith was that his attention was drawn to the deceased's newspaper stand by the shouts of the deceased that he was being robbed. The witness stated that he stood for several minutes observing the scene and that he then observed the deceased chase two men westerly along 53rd Street. After a short chase, one of the men turned and shot the deceased.

Smith later identified the defendants as the two men whom he saw with the deceased at the time of the shooting, and specifically identified Taylor as the man who fired the shot. At the trial, Smith gave a detailed description of the wearing apparel of the defendants on the morning in question. He further testified that his initial description of the defendants stemmed from police photographs and that he later identified the defendants at the November 14th lineup. Smith again identified the defendants at trial, and his identification was unshaken on cross-examination.

While it is true that Smith did not report his observations to the police until some time after the in-

cident, he testified that he did not do so for the reason that he "feared for my life to identify the defendants in that neighborhood." This was a matter of credibility for the jury, especially in light of Smith's testimony that he had seen one of the defendants in the neighborhood prior to the incident.

█ Defendants' attack on the credibility of Perry Smith is unavailing. They first argue that he did not have the requisite time or opportunity to definitely fix the features or characteristics of the two assailants, and therefore, the fact that he was a stranger to the defendants casts grave doubt upon his identification testimony. (See People v. Gold, 361 Ill 23, 196 NE 729.) It was for the jury to determine from the evidence whether Smith had such time and opportunity as to definitely fix the identity of the assailants.

█ Another matter for resolution by the jury was the fact that Smith named Stringer as one of the two defendants he had seen in the neighborhood prior to the incident, but when later pressed on cross-examination concerning the matter he physically pointed to Taylor as the one he had seen before, calling him "the biggest man" of the two defendants.

Defendants also contend that Smith, on direct examination, "clearly left the impression" that he had alighted from the elevated train at 51st Street prior to the incident, whereas, on cross-examination, he stated that he alighted from an automobile near the 51st Street station. A reading of Smith's testimony in this regard does not "clearly" leave such impression; nevertheless, this was a matter for the jury to determine.

John McGarry testified that he was told by Smith that Smith had observed the defendants in the small room in the Criminal Courts Building immediately prior to viewing them in the lineup on November 14th, and further that Smith told him that he first identified Taylor from police photographs at the police station; Smith

testified to the contrary. It should be noted that while defense witness Dunbar testified that he and Smith did observe the defendants in the small room prior to the lineup, he stated that he saw their backs and not their faces. Further, McGarry testified that Smith at all times maintained that he was able to identify the defendants as the two men who committed the offenses charged in the indictment. This was also a matter for the jury.

Finally, the testimony of Carl Dunbar on direct examination, that he was not certain whether the defendants were the same two men whom he observed run past the alley, in no way weakens the identification testimony given by Smith. Dunbar was called as a defense witness, and not as a witness for the People. Further, on cross-examination, Dunbar admitted that he previously told the police that Taylor was one of the men who ran past the alley and that Stringer was possibly the other man.

The cases cited by the defendants on the question of the credibility of identification testimony are inapposite on their facts from the instant case. See People v. Gold, 361 Ill 23, 196 NE 729; People v. Fiorita, 339 Ill 78, 170 NE 690; People v. Kidd, 410 Ill 271, 102 NE2d 441.

Defendants next contend that they were denied due process of law inasmuch as their confrontation with Smith and Dunbar prior to the trial was unlawful, unfair and unnecessarily suggestive.

They first argue that the trial court erroneously denied their motion to suppress the identification testimony of Smith and Dunbar for the reason that the defendants were removed from the County Jail to the Criminal Courts Building for the purpose of being shown in a lineup without a court order, or without their permission or the permission of or notice to their counsel in the unrelated pending cases.

■ Defendants were shown in the lineup prior to the return of the indictment on the instant charges. The fact that they were represented by counsel in the unrelated matters did not, without more, give them the right to have him notified of the November 14th lineup which was held prior to the effective date of United States v. Wade, 388 US 218, and Gilbert v. California, 388 US 263. (See Stovall v. Denno, 388 US 293, which limits the applicability of those decisions to the date thereof, June 12, 1967. See also People v. Nelson, 40 Ill2d 146, 238 NE2d 378.)

■ It cannot be said that the defendants were denied due process of law by the mere fact that they were taken from County Jail to the Criminal Courts Building without their or their counsel's permission, or without an order of court. Defendants were properly in custody awaiting trial on other charges and they were not discriminated against by being in custody due to the fact that they were unable to make bail. Rigney v. Hendrick, 355 F2d 710. There is no real difference between the situation at bar and one where the police take a suspect into custody off the street after he has been identified through police photographs.

Defendants contend that the requirements of Stovall v. Denno, 388 US 293, were not complied with in the conduct of the lineup; they argue that the confrontation between the defendants and the witnesses was so unnecessarily suggestive and conducive to irreparable mistaken identification that they were denied due process of law. They state that there were six men in the lineup, including the defendants, and that the other four men were "considerably shorter" than the defendants. They further state that the other four men were also unclean and disheveled looking and wore "civilian type" haircuts, whereas the defendants were clean and neat in appearance and wore their hair in a "military cut." Further, they argue, both Smith and Dunbar observed

265

the defendants in the small room immediately prior to the lineup.

■ ■ It was held in the Stovall case that the "totality of the circumstances" surrounding a pretrial confrontation between a witness and an accused will govern the admissibility of an in-court identification by that witness. Where an accused does not present such evidence as is sufficient to establish the unfairness of the pretrial confrontation, the in-court identification may be admitted into evidence where it is shown by clear and convincing evidence that it had an independent origin, arising from the witness' uninfluenced observation of the accused. People v. Nelson, 40 Ill2d 146, 238 NE2d 378.

The record shows that on the morning of the incident, Perry Smith observed Dority's assailants for several minutes under lighting conditions which enabled Smith to give a detailed description of the wearing apparel of the assailants. The record further shows that Smith had seen one of the defendants in the neighborhood on an occasion prior to the incident. The record shows that, prior to viewing the lineup, Smith had identified both defendants from police photographs. Finally, the record does not reveal a single instance where Smith failed to identify the defendants as the assailants, or where that identification was in any way shaken.

Smith testified that he did not see the defendants in the small room prior to viewing the lineup, whereas McGarry testified that he was told by Smith that Smith had seen the defendants in the room. Carl Dunbar also testified that he and Smith saw the defendants in the small room prior to the lineup, but stated they only saw the backs of the defendants. Nevertheless, the question of whether or not the conditions during and immediately prior to the lineup were suggestive is obviated by the independent prelineup identification of the

266

defendants from the photographs and by the circumstances surrounding Smith's observation of the incident and the assailants. People v. Nelson, 40 Ill2d 146, 238 NE2d 378. The ability of a witness to identify a suspect cannot be said to have been erased from his mind merely because he improperly saw the suspect prior to a lineup. People v. Cook, 113 Ill App2d 231, 252 NE 2d 29.

■ ■ Defendants next contend that they were not proven guilty beyond a reasonable doubt. As to the murder charge, the testimony of Perry Smith as to what he observed at and near the Dority newspaper stand, as well as his identification of the defendants as the assailants, was not shaken on cross-examination. The testimony of a single witness, where positive and the witness credible, is sufficient to sustain a conviction. People v. Robbins, 88 Ill App2d 447, 232 NE2d 302. Further to be considered against Stringer is the testimony of the police officers to the effect that Stringer admitted killing Dority, after appearing in the lineup.

■ As to the robbery conviction, the evidence for the People shows that Perry Smith, walking along Indiana Avenue toward 53rd Street, heard Dority shouting, "Holdup, holdup, holdup, they are robbing me, they are robbing me." He stopped and later observed Dority chase the two defendants westerly along 53rd Street. During the defendants' case, Carl Dunbar testified that he was in the alley between Michigan and Indiana Avenues, a short distance from 53rd Street, when he heard what sounded like a gunshot and then observed two men run past the alley, one of them stating, "Come on, come on, I got it." Finally, the deceased's widow testified that her husband had $40 in his pocket when he left home for work some seventy minutes before the incident, and Officer Boynes testified that the deceased had no money on his body when it was removed to the

morgue. There was sufficient circumstantial evidence from which the jury could find the defendants guilty of robbery.

Defendant Taylor maintains that the trial court erred in denying his motion for a separate trial inasmuch as the statement made by Stringer after the lineup was not joined in by Taylor and therefore prejudiced him at the trial.

While the comments made by Stringer after the lineup, in their entirety, did implicate Taylor, the portion of those comments heard by the jury related only to Stringer, the balance relating to Taylor having been stricken by the trial judge at the close of the hearing on the motion to suppress the statement. All reference to Taylor, either direct or by implication, having been stricken from the statement, the trial judge did not abuse his discretion in refusing to grant a severance. Taylor further states that there was no instruction given to the jury that Stringer's statement should be considered as to Stringer alone, but it does not appear that any such instruction was requested by him. (See IPI—Criminal, c 3.08.)

Defendants next contend that the statement of Stringer was improperly admitted into evidence for the following reasons: it was obtained while Stringer was in the unlawful custody of the police; it was obtained without the presence of counsel; and it was taken without Stringer having been advised of his constitutional rights.

It should be first noted that while the defendants were under indictment at the time they were shown in the lineup, the indictments in no way related to the crimes charged here. Defendants were not yet indicted for the crimes charged here, and although represented by counsel in those cases, they were not represented by counsel relative to the instant matter. (See People v. Lagardo, 39 Ill2d 614, 237 NE2d 484.) The question of defendants' "unlawful detention" by the police

after having been taken from County Jail to the Criminal Courts Building has been dealt with above.

■■ ■■ In connection with defendants' contention that Stringer's statement was taken without his having been advised of his constitutional rights, that was a matter of credibility for the trial court at the hearing on the motion to suppress the statement. Officers Marin and Fitzgerald testified that the defendants did receive the required constitutional warnings prior to being shown in the lineup, which Stringer denied in his testimony. It has long been held that a determination as to credibility reached by the trier of fact will not be overturned in the absence of manifest error.

■■ Stringer however contends that the question of credibility is not important; he argues that he was the victim of "psychological coercion" during the "unlawful detention," thereby rendering the statement inadmissible. (See McNabb v. United States, 318 US 332; Mallory v. United States, 354 US 449; Miranda v. Arizona, 384 US 436.) Not only did Stringer make the statement after the lineup had been concluded, but there was a conflict in the evidence as to what transpired in the small room where the defendants were being held, both before and after the lineup. Under the People's evidence adduced at the hearing on the motion to suppress the statement, the trial judge could reasonably have found that the defendants were not in fact subject to the "psychological coercion" which Stringer suggests. The situation presented here consequently does not, ipso facto, call for the application of the cases cited by defendants in this regard.

Defendants finally contend that the trial court improperly refused to give to the jury Defendants' Instruction #13, which they argue stated their theory of the case, namely, that they had not been sufficiently identified as the persons who committed the offenses charged in the indictment.

269

It is clear from a reading of the instruction that its primary thrust does not relate to a statement of the defendants' theory of the case, but rather relates to the credibility of the identification witnesses. The instruction states that the jury, in determining whether or not a defendant has been identified as the perpetrator of the offense charged in the indictment, must consider all the testimony in the case. The instruction then goes on to enumerate what elements "must" be considered in determining whether there was satisfactory evidence adduced which identified the defendant as the offender.

We are in agreement with defendants' contention that they have a right to have an instruction given to the jury properly presenting their theory of the case (People v. Provo, 409 Ill 63, 97 NE2d 802) but Defendants' Instruction #13 did not properly present such theory. Further, there is nothing in the record to show that a properly drawn instruction of that nature was tendered by the defendants after Instruction #13 was refused.

There were other instructions given on behalf of the defendants relating to the credibility of witnesses, and the trial court did not err in refusing Instruction #13 since the court was not bound to give an instruction which is repetitious of other instructions. People v. Dilworth, 67 Ill App2d 384, 214 NE2d 9.

The case of Salley v. United States, 353 F2d 897, cited by the defendants, is not in point. The trial court in the Salley case refused to give an instruction which specifically related to the degree of proof necessary in order to identify the defendant as the perpetrator of the offense charged in the indictment. The reviewing court reversed, stating that the defendant had a right to have the jury instructed as to his theory of the case, that he was not identified as the offender. The instruction in the Salley case related to the degree of

proof of the accused's identity as an element of the case, whereas here, the instruction relates to what factors the jury was to consider in weighing the identification testimony and in determining the credibility of the identification witnesses. Another distinguishing fact in the Salley case is that it involved a narcotics transaction involving a police undercover agent; the reviewing court went into detail concerning the necessity of and the dangers attendant to the employment of the police undercover agents in the infiltration of the narcotics world and the confusion as to the identification of suspects which may arise due to a single agent's involvement in numerous cases at one time, involving many different persons. No such situation is presented here.

For these reasons the judgments are affirmed.

Judgments affirmed.

McCORMICK, P. J. and LYONS, J., concur.