The People of the State of Illinois, Plaintiff-Appellee, v. Louis Dilworth, Defendant-Appellant.

Gen. No. 65–11.

Third District.

February 8, 1966.

William H. Henning, of Galesburg, for defendant-appellant.

Donald C. Woolsey, State's Attorney, of Galesburg, for plaintiff-appellee.

CORYN, P. J.

The defendant, Louis Dilworth, was charged in a multiple count indictment with murdering his wife, Mary Louise Dilworth, on July 24, 1963, in Knox County. The jury found him guilty of murder as charged in Counts II, IV and VI of the indictment. Judgment was entered on this verdict, whereupon defendant was sentenced to a term of from twenty-five to forty years in the Illinois State Penitentiary. From this judgment, defendant takes this appeal, raising numerous issues, but not contesting the sufficiency of the indictment.

The prosecution's evidence established that the defendant and his wife worked and lived in Carbondale, Illinois, with several of their minor children. On July 17, 1963, the decedent left her husband and went to Galesburg, Illinois, to stay with her son-in-law and daughter, Robert Campbell, Jr. and Margaret Jane Campbell. When the defendant discovered that his wife had left him, he went to the Carbondale home of another of his married daughters, Willa Mae Johnson, and her husband, Michael Johnson, to find out if she and her husband knew of his wife's whereabouts. Neither gave Dilworth any information, but did consent to drive him to Memphis to see if Mrs. Dilworth was visiting there with her sister. When they got as far as Fullerton, Kentucky, they called Memphis and were told that the decedent was not there. Dilworth then insisted on going to Galesburg, where they arrived on the morning of July 18. During this trip to Galesburg, the defendant repeatedly told the Johnsons that he would kill his wife if she did not return to Carbondale with him. Upon meeting his wife that morning and being told by her that she would not return to him, he threatened to kill her,

387

and then wrote a note (People's Exhibit 8) stating this was his intention. Because of these threats, defendant was taken into custody by the Galesburg police on July 19. On July 22 Dilworth was released from jail and returned to the Campbell residence where he again threatened to murder his wife. On July 23, defendant drove to Knoxville, Illinois, where he purchased a .32 caliber Iver Johnson revolver (People's Exhibit 3) and a box of cartridges. The next evening, July 24, at about 8:30 p. m., defendant and his wife were sitting on the front porch of the Campbell residence. Jeanette Dilworth, their twelve-year-old daughter, testified that she was leaning on her father's car, which was parked on the street in front of the Campbell residence. She stated that she observed her parents arguing, and heard Dilworth say, "Louise, come on and go back home with me." Her mother replied, "Louis, I told you I was tired being treated like a dog." Jeanette Dilworth stated that her father then started to arise, shot her mother, who was seated in a chair, and then shot himself. Virginia Dilworth, a fourteen-year-old daughter, testified that she also was in front of the Campbell residence near said car, when she heard a shot, and turning toward the porch, saw her mother crumple to the floor, and saw her father shoot himself.

Louis Dilworth testified on his own behalf, claiming that the shooting was an accident. He stated that he had given the gun and shells to his wife, but that when he returned to the Campbell porch she handed him the gun, warning him to be careful as she had loaded it. Dilworth said that he placed the gun in his left shoe and sat on the corner of the porch with his feet on the steps. The decedent then came up behind him, kissed him, and then reached over his shoulder for the gun. Defendant claims that his finger was "behind" the trigger, and that his wife then placed her finger "inside" the trigger and raised the gun. Dilworth stated that he then "snatched"

his finger out, and the gun went off, the bullet entering his chest. He says that his wife started to back into a chair, and in so doing hit the arm of the chair, jarring the gun and causing it to fire, this bullet striking her.

■ The trial of this cause commenced on December 9, 1963, with the selection of the jury. On December 11, 1963, the prosecution called its first witness, Margaret Haines, whose testimony was immediately objected to by defendant on the ground that her name was not listed as a witness on the indictment. It appears that only Jeanette Dilworth, Virginia Dilworth, Robert Campbell, Margaret Campbell, and William Allison, a police officer, were listed on the indictment. The State's Attorney, when this objection was made, submitted to the defendant's counsel a list of all witnesses he intended to call to testify, with a suggestion that he would secure the additional witnesses for interview by defendant's counsel if so desired. This seemed to satisfy the defendant's attorney, and there was no further objection to the testimony of any of the witnesses not listed on the indictment, there was no claim of surprise, and no request for additional time for preparation of the defense. Ch 38, § 729, Ill Rev Stats (1961), in effect at the time of the trial of this cause, has been superseded by ch 38, § 114–9, Ill Rev Stats (1965), but the former section is substantially similar to the new provision. The former statutory provision has been construed to mean that it is within the sound discretion of the trial court to permit witnesses to testify whose names were not endorsed on the indictment, and that this discretion will not be reviewed unless it appears that the defendant was taken by surprise. People v. Weil, 243 Ill 208, 90 NE 731; People v. Steinhauer, 248 Ill 46, 93 NE 299.

■ The defendant next contends that People's Exhibit 5, a bullet removed from the body of Mary Louise Dilworth, was not properly identified, and therefore this exhibit should not have been admitted in evidence.

389

Dr. Jackson K. Erffmeyer, Coroner of Knox County, testified that this exhibit was similar to the only slug he removed from the body of Mrs. Dilworth on the night of July 24, 1963, and that he then took it to the Galesburg Police Station, giving the slug to Detective Jesse Moss. Moss stated that he received People's Exhibit 5 from Dr. Erffmeyer at approximately 11:00 p. m. on July 24, and thereafter gave it to Detective Sergeant William Allison. Allison stated that he received the exhibit from Moss on the morning of July 25, that he did not mark the slug as he was afraid such a mark might impair ballistics examination, and that he sent this slug in an identified or labeled box to the FBI laboratory. Defendant argues that because no identification mark was placed on this slug, and because the FBI personnel, receiving the slug in the labeled box, examining it, and then returning it to the box and mailing it back to the Galesburg police, did not testify, there was a failure of proper identification, and lack of proof of continuity of possession. This slug was unquestionably of .32 caliber, as were the two empty cartridges and three loaded cartridges (People's Exhibit 4), which were removed from defendant's .32 caliber Iver Johnson revolver (People's Exhibit 3). We agree with the prosecution that it would not have been feasible for the coroner or Galesburg police officers to mark this slug as this might have made it impossible to perform a ballistics examination on the slug. The testimony of the coroner and Galesburg police officers regarding this exhibit, and the fact that this exhibit was part of a series of exhibits, i. e., the gun, and loaded and spent cartridges removed from the gun, was sufficient to allow People's Exhibit 5 into evidence. People v. Fisher, 340 Ill 216, 236, 172 NE 743.

Deputy Sheriff Hugh Allison was called as a rebuttal witness by the People, and testified that he was present on August 15, 1963, in the hospital room occupied by defendant, and heard defendant say that he was intoxicated

at the time of the shooting, and therefore had no memory of what occurred. On cross-examination it was brought out that Allison had been acting as bailiff in charge of the jury in this case, whereupon defendant moved for a mistrial. Further examination of Allison indicated that he had not discussed this case with any of the jurors at any time. The court then, on its own motion, substituted Sheriff Max Jones as bailiff in the place of Allison. Defendant argues that the mere use of a bailiff as a prosecution witness deprived him of a fair and impartial trial.

A jury must be free from outside influences when it makes its decision. Conduct of a bailiff, or other officers of the court, may be so prejudicial so as to require a new trial, such as in the case of People v. Kawoleski, 313 Ill 257, 145 NE 203, where the bailiff stated, in the presence of the jury, that "it should not take more than two or three minutes to convict that bird." In People v. Berry, 18 Ill2d 453, 165 NE2d 257, where the prosecutor, during recess, asked the jury, "How was the weekend?" and "Did it drag?", the court, refusing to reverse the conviction, stated at page 459: ". . . While the conduct of the prosecutor in thus speaking to the jury cannot be condoned, it is clear that it does not constitute reversible error. In order to justify setting aside the verdict of a jury because of an unauthorized communication with them, it is necessary to show the defendant was prejudiced. Here there was no mention of the case or any part of it, nor has defendant suggested any other facts to show that prejudice resulted." In the instant case there was no outside communication to the jury by the bailiff, and no evidence that prejudice resulted merely because the bailiff was called as a rebuttal witness. Also, the trial court immediately took the proper precautionary measure by replacing Allison as bailiff with Sheriff Jones, who did not testify in this case.

The key witness for the prosecution, who witnessed the shooting, was Jeanette Dilworth, the twelve-year-old daughter of the defendant and decedent. On direct examination, she testified with clarity and consistency about the occurrence. The defendant claims that he was deprived of a fair and impartial trial because of the court's failure to inquire into her competency. The record indicates that there was no preliminary examination requested of or made by the court for the purpose of determining either her intelligence or her understanding of the meaning of testifying under oath. At the conclusion of direct examination, defendant moved to strike her testimony and for a mistrial, which motion the court denied at that time. However, the court specifically indicated that it would reconsider this motion if the defendant could establish, by cross-examination or otherwise, the incompetency of the witness. The defense then commenced a long and rigorous cross-examination during which the witness again exhibited sufficient intelligence and capacity to properly testify. Also, her testimony on cross-examination was clear and consistent with her testimony on direct examination. No further motion was made by defendant to exclude her testimony, nor was any evidence offered by defendant to establish that she was mentally incompetent, as claimed by defendant. Because she was a minor, it definitely would have been better practice for the trial court to have interrogated Jeanette Dilworth as to her competency to testify as a witness to the murder. However, the lengthy and rigorous direct and cross-examination of this witness certainly supplied the trial court with enough information regarding her competency as a witness. Whether a child shall be permitted to testify rests largely in the discretion of the trial court. People v. Davis, 10 Ill2d 430, 140 NE2d 615; People v. Karpovich, 288 Ill 268, 123 NE 324. We find no abuse of discretion here.

 The defendant next makes several arguments regarding the instructions. First, he contends that the court erred in refusing Defendant's Instruction No. 5, on the grounds that it was already covered by Court's Instruction No. 2. The defendant had presented evidence tending to establish his good reputation in Carbondale as a peaceful and law abiding citizen. Both the Court's Instruction No. 2 and Defendant's Instruction No. 5, almost identical in language, informed the jury as to how they were to consider this type of evidence. The only difference in these two instructions was that the Court's Instruction No. 2 directed the jury to consider this evidence, "with the other evidence in the case, *in determining the question of defendant's guilt or innocence,*" whereas Defendant's Instruction No. 5 directed the jury to consider this evidence, "with the other evidence in the case, *in determining the question whether any witness who testified to facts tending to incriminate him has been mistaken or has testified falsely or truthfully.*" (Emphasis added.) Defendant argues that the giving of Court's Instruction No. 2 was error, as this instruction fails to cover credibility of the witnesses. Repetition of an instruction is to be avoided, and to merely restate a proposition of law in different language is a repetition. People v. White, 308 Ill 210, 139 NE 58. Further, the jury was fully instructed on the law regarding credibility of witnesses by the giving of People's Instruction No. 11.

 Defendant assigns as error the giving of People's Instruction No. 10, defining the crime of murder; the giving of Court's Instruction No. 1, outlining the proof required under each of the six counts of the indictment; and the refusal to give Defendant's Instructions 12 through 17, each being a separate instruction regarding the proof required on each of the six counts of the indictment. The defendant also argues that it was error to refuse Defendant's Instruction No. 4, as

being covered by People's Instruction No. 2. Both of these instructions informed the jury how they should weigh the testimony of the accused. The underlying reason for defendant's claim of error regarding. these instructions is his insistence that he "is entitled to his own instructions covering his theory" of what the law is in the particular case. Clearly this argument is fallacious, as it is for the court to instruct the jury as to the proper law to be applied by them to the case. The function of the trial attorney, whether for prosecution or defense, is to assist the court by tendering instructions. We have carefully reviewed all of the instructions tendered herein, whether given, refused, withdrawn, or modified, and are of the opinion that the court properly instructed the jury. "The court is not required to give a number of different instructions upon the same subject, and it is not error to refuse to give a requested instruction, notwithstanding, it states a correct principle applicable to the case, if it has already been covered properly and sufficiently by other instructions given. An accused, therefore, cannot complain, although the court does not give the instructions he prefers, where the instructions given cover the entire law of the case." 15 ILP 191, Criminal Law, § 662.

Defendant's last contention, that his guilt was not established beyond a reasonable doubt by sufficient credible evidence, is, we believe, unfounded. It is undisputed that the defendant often, both orally and in writing, threatened to kill his wife. In furtherance of this design, Dilworth, by his own admission, purchased a revolver the day before the fatal shooting. The occurrence was witnessed by two of the defendant's daughters, and only moments later, the defendant was disarmed by Robert Campbell, who resided on the premises where the incident occurred.

Accordingly, the judgment of the Circuit Court of Knox County is affirmed.

Affirmed.

ALLOY and STOUDER, JJ., concur.