MELVIN CHAMPION, a Minor, by His Mother and Next Friend, Willie Mae Champion, Plaintiff-Appellee, *v.* EDMUND KNASIAK *et al.*, Defendants. —(ILLINOIS BELL TELEPHONE COMPANY *et al.*, Defendants-Appellants.)

(No. 60354;

First District (5th Division)—December 13, 1974.

L. Bow Pritchett and Edward Butts, both of Chicago, for appellants.

Michael H. Postilion and Frank P. Kronenberg, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

This is a negligence action brought on behalf of a minor plaintiff to recover damages for personal injuries sustained when he was allegedly struck by two automobiles, the first owned by defendant Edmund Knasiak and driven by defendant Joellyn Knasiak, the second owned by defendant Illinois Bell Telephone Company (hereafter Bell) and operated by defendant Richard Coleman, its employee. The trial court directed a verdict in favor of Edmund Knasiak on the ground that Joellyn Knasiak was not operating his automobile as his agent. The jury then returned

a verdict for the plaintiff in the amount of $28,000 against the remaining three defendants. Judgment was entered on the verdict from which only defendants Bell and Coleman have appealed.

The issues presented for review are (1) whether plaintiff failed to prove that Coleman and Bell proximately caused any injury to him; (2) whether plaintiff's counsel prejudiced defendants' rights to a fair trial in (a) placing in evidence events after the accident, (b) asking Coleman to comment on a written statement made by other witnesses, (c) inferring that defendants had concealed evidence, and (d) appealing to prejudice; (3) whether the court erred in permitting a youth who witnessed the accident to state his opinion on Coleman's ability to avoid the accident and further in permitting counsel for plaintiff to comment on the opinion; and (4) whether the trial court's refusal to hold a hearing at the trial to determine the competency of the plaintiff's minor witnesses deprived Coleman and Bell of a fair trial.

The accident in question occurred on 103rd Street, a short distance west of Wallace Avenue in Chicago. Plaintiff, age 6½, was running across 103rd Street in a northerly direction when he was struck by an eastbound vehicle driven by Joellyn Knasiak, the impact catapulting him into the westbound lane. An approaching westbound Bell automobile driven by Coleman stopped near where the boy had fallen. The evidence conflicted as to whether the Bell vehicle struck plaintiff.

James Champion, plaintiff's brother, 9 years of age at the time of trial, testified that he, plaintiff, and Billy Jordan were playing on the south side of 103rd Street in Billy Jordan's front yard when plaintiff left to get a shovel at his house on the north side of 103rd Street. From Billy's front yard, he saw plaintiff get hit by two cars going in opposite directions. First, a white car hit him. Then, as plaintiff was in the street trying to get up, the front part of a green car struck him. James also said that he first heard a car skid, and when he looked out he saw plaintiff falling. He saw the front left wheel of the white car strike plaintiff; plaintiff was struck on the way back from his house after getting a shovel; but James did not tell his mother he had witnessed the accident because he was scared. In fact, he denied having seen the accident when asked by his mother on numerous occasions for more than four months after the accident.

Another of plaintiff's brothers, Jerry Champion, 11 years of age at the time of trial, testified that he was on the front porch of the Champion house on the north side of 103rd Street when he heard a car putting on its brakes. He looked up and saw a white car going east toward Wallace that had already hit plaintiff and was stopping. Plaintiff was flying through the air and landed in the westbound lane slightly west

of Wallace. Jerry ran down the porch steps, around to the front of the house and toward plaintiff. When he was a few feet from plaintiff, he saw for the first time an approaching green car down by a pet shop east of the Wallace intersection with 103rd Street. Plaintiff was lying on his back with his head touching the center line of 103rd Street and his legs to the north in the westbound lane. Although he stated that the green car came by and hit plaintiff, he did not know what part of plaintiff's body was struck nor what part of the green car made contact. The green car did not stop immediately but traveled two or three car lengths beyond plaintiff, who was still thrashing around after the green car hit him. Jerry saw only one person in the green car. After the occurrence, Jerry went back to the house and got his mother.

Michael McAlister, age 15, worked part-time at the Fernwood Newspaper Agency on the northeast corner of the intersection of 103rd and Wallace. He testified that he was walking west across Wallace close to the north edge of 103rd Street. When he was about halfway across Wallace, he observed plaintiff leave the sidewalk on the southwest corner of the intersection and run directly north across 103rd Street. McAlister saw an approaching eastbound light-blue Pontiac and "hollered" at plaintiff to stop. At that instant, the left front side of the Pontiac struck plaintiff in the left thigh area. McAlister heard the Pontiac's brakes screeching, and although he had no driving experience at that time, he estimated its speed at 30 to 35 miles per hour. The Pontiac traveled about 15 feet after impact and left skid marks on the street. The lady who had been driving the Pontiac left it in the position where it stopped and got out.

McAlister further testified that plaintiff was thrown up into the air and landed on his back in the westbound lane. His head was on the center line and his feet were to the north. He laid still after landing. McAlister immediately started to run towards plaintiff at an angle to the southwest but looked over his left shoulder to the east before crossing into the street and saw the westbound Bell car crossing Wallace. He estimated its speed at 30 miles per hour. The Bell car passed him on his left and struck plaintiff without slowing down or changing direction. McAlister could see its taillights, and they did not go on before it hit plaintiff, although it stopped at impact.

McAlister stated that he was near the northwest corner when the Bell car passed him, but he was able to run behind it and to the south in time to see the left front tire run over plaintiff's leg. At that time, plaintiff was lying only a few feet west of Wallace. He did not know which leg was run over by the Bell car.

McAlister stated that when the Bell car stopped, plaintiff's legs and

thighs were beneath the car forward of the left rear wheel. Plaintiff was lying with his head to the south and his legs to the north. McAlister heard the Bell driver say, "I thought it was a dog." The Bell driver held plaintiff in his arms until an ambulance arrived but left the scene before the police arrived. The Pontiac driver also left but later returned after the police had arrived. McAlister gave the police the license number of the Bell car.

Joellyn Knasiak testified that she was driving eastbound on 103rd Street approaching Wallace, traveling at 24 to 30 miles per hour, when plaintiff suddenly appeared in her lane of travel a short distance ahead of her. She applied her brakes and swerved to the right but struck the boy. She did not see the Bell car strike plaintiff, but after she stopped her car she saw the Bell car stopped in the westbound lane. At that time plaintiff was beneath the car forward of the left rear wheel. He was trying to get up, but the Bell driver was holding him down.

Richard Coleman, age 45, an assignment foreman for Bell, stated that he was working with William Bailey picking up disconnected telephones on Saturday, April 4, 1970. He was driving westbound on 103rd Street and, as he reached the east edge of Wallace traveling at about 25 miles per hour, he observed plaintiff on the southwest corner about 30 feet west of Wallace. Plaintiff was alone on the sidewalk about a foot or two from the curb and was running east along the right side of a car illegally parked in the bus stop. When he reached the front of the parked car, he turned sharply and ran into the street. Coleman was about in the middle of Wallace when plaintiff left the curb, and he immediately applied the brakes. Plaintiff ran into the eastbound lane a foot or two in front of Mrs. Knasiak's car, which was traveling about the same speed as Coleman's. The middle of the front bumper struck the boy's left leg. It appeared to him that plaintiff turned to look at Mrs. Knasiak's car just as the impact knocked him physically out of his shoes into the air, and his head then struck the hood of the Knasiak vehicle. When plaintiff was struck, Coleman was braking his car at the west edge of Wallace and turning slightly to the right. Plaintiff was thrown in a northeasterly direction. Coleman lost sight of him as he landed near the side of the left front fender of the Bell vehicle which traveled not more than two to four feet further, coming to a stop facing northwest. Coleman did not see, hear or feel anything to indicate contact with plaintiff's body. He stated that his car did not strike the boy.

Coleman was the first person to reach plaintiff, and he observed that his legs were pointing north but were not beneath the car. He attempted to hold plaintiff by the shoulders to keep him from moving. In his attempt to rise before Coleman reached him, plaintiff was thrashing

around and had moved in a generally easterly direction toward the rear of the car. Coleman told Bailey to call an ambulance and asked someone in the crowd that gathered to get plaintiff's mother. Mrs. Knasiak came over to the site but then returned to her car. Coleman stayed with the boy until the ambulance arrived, and no one at the scene accused him of having struck plaintiff.

When plaintiff and his mother left in the ambulance, Coleman looked around for Mrs. Knasiak but did not see her. Both lanes of travel were blocked and eastbound traffic was backed up. No police were present and, assuming that they were not involved and since they could easily be located because of their plainly marked car, Coleman and Bailey went back to work.

William Bailey, age 23, not employed by Bell at the time of the trial, was a front seat passenger in Coleman's car. He was checking the routing slips for their afternoon stops. As they approached Wallace, he observed three or four children playing on the southwest corner of the intersection in front of a building, and he observed that eastbound traffic was approaching. He did not see the Knasiak car strike plaintiff, since he was looking down at his routing slips, but he heard tires screeching and when he looked up he saw plaintiff flying through the air across the street. The Bell car was just entering the Wallace intersection and was traveling at about 5 or 10 miles per hour. Coleman quickly applied his brakes and their car stopped just west of the west curb of the intersection. Bailey lost sight of the boy as he landed near the front left side of the Bell car at a point between the door and the front fender. He did not see, hear, or feel anything to indicate that plaintiff came into contact with the Bell car.

After he got out of the car and went around to the driver's side, Bailey observed plaintiff lying beside the car ahead of the left rear wheel. No part of his body was beneath the car. Coleman was already administering first aid and was moving the conscious boy to the back of the car to get him out of traffic. At Coleman's request, Bailey called an ambulance. After the ambulance left with plaintiff and his mother, the crowd dispersed and, since there were no police at the scene, he and Coleman went back to work. No one at the scene had accused them of hitting plaintiff or asked for their names and addresses. Bailey did not check the Bell car for damage, because it had not struck the boy.

Plaintiff injured his forehead and left leg. The forehead injury was a laceration which was sutured at the hospital. The left leg injuries were a fractured left femur and a torn femoral artery. His right leg was not injured.

After leaving the scene, Coleman and Bailey completed their day's

work. They then returned to the company garage where Coleman parked the car and mentioned to the wire chief on duty that he had witnessed an accident but filled out no report. He was unaware of any company policy which required employees to fill out any report forms when they witnessed accidents.

That evening, Coleman received a call from the duty foreman, who told him that the police had called seeking the identity of the Bell employee who had been at the accident scene. Coleman was given the number of a police sergeant to call. He called the police sergeant, went to the company garage, and then drove the car to the downtown Bell building where he picked up Jerome Engram of the Bell Security Department. They went to the police station where two policemen examined the car with a spotlight in the presence of Coleman and Engram. There were no dents or scratches or marks of any kind on the car and, to Coleman's knowledge, the officers found no red mark on the tread of the left front tire. However, Engram later testified that the police found a red mark on the tread of the left front tire. This mark, however, was never identified as blood, and the car was not impounded.

OPINION

I.

Defendants first contend that plaintiff failed to prove that any injury to him was proximately caused by Bell or Coleman.

■■ Every tort action grounded in negligence requires the showing of (1) a duty owed by defendant to plaintiff; (2) a breach of that duty, *i.e.*, a negligent act or omission; and (3) a resulting compensable injury which proximately results from the breach. *Lasko v. Meier*, 394 Ill. 71, 67 N.E.2d 162; *Fugate v. Sears, Roebuck & Co.*, 12 Ill.App.3d 656, 299 N.E.2d 108.

Here, defendants Bell and Coleman challenge the sufficiency of the proof of proximate causation. They refer us to the comment on subsection 1 of section 433B of Restatement (Second) Law of Torts (1965), at page 442, stating as follows:

> "Subsection (1) states the general rule as to the burden of proof on the issue of causation. As on other issues in civil cases, the plaintiff is required to produce evidence that the conduct of the defendant has been a substantial factor in bringing about the harm he has suffered, and to sustain his burden of proof by a preponderance of the evidence. This means that he must make it appear that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the harm. A mere possibility of such causation is not enough; and when the matter re-

mains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."

Under this reasoning, they argue, the evidence here was insufficient to create a prima facie case of any negligence on their part which proximately contributed to cause plaintiff's injuries.

■■ The trial court here relied on *Osinski v. Benson*, 323 Ill.App. 562, 56 N.E.2d 665, in denying the motion for a directed verdict. In *Osinski*, plaintiff, a bicycle rider, recovered damages from the drivers of two cars who combined to cause his injury. The evidence indicated that the right front side of the first car hit plaintiff from the rear, spinning him around and knocking him down into the path of a second car. Although the evidence indicated that the more grievous injury was caused by the second vehicle (and the jury's award reflected this in apportioning damages), yet both drivers were held on appeal to be jointly and severally liable for the total damages. This was predicated on a rule cited in *Osinski*, at page 570, that "* * * where the negligence of two or more persons, even though acting independently of each other, united in causing an injury, they are joint tortfeasors, and are jointly and severally liable for the resulting damages."

■■ In its reliance on *Osinski*, the trial court apparently was of the opinion that the evidence as to contact between the Bell vehicle and plaintiff was sufficient to create a jury question on the issue of negligence. Concerning the question of contact, we note that James Champion stated that he saw the front part of the Bell car hit plaintiff. Jerry Champion stated that he saw the Bell vehicle hit plaintiff, although he did not know what part of the car hit him nor what part of his body was struck. Finally, Michael McAlister stated that he saw the left front tire run over plaintiff's leg. This evidence, when considered with the testimony of plaintiff's brothers and McAlister indicating the existence of an adequate interval of time between the contacts so that the second might have been avoided, was sufficient to allow the case to go to the jury.

## II.

Defendants Bell and Coleman also cite numerous alleged errors which they contend prejudiced their right to a fair trial. While the object of review is not to determine whether the record is completely free of error; nevertheless, a case will be reviewed to ascertain whether upon the trial there has been such error or accumulation of errors as might prejudice the rights of a party. *Adamaitis v. Hesser*, 56 Ill.App.2d 349, 206 N.E.2d 311; *Bulleri v. Chicago Transit Authority*, 41 Ill.App.2d 95, 190 N.E.2d 476.

From our review of the entire record, we are of the opinion that errors were committed in the course of the trial which in their totality denied defendants Bell and Coleman their right to a fair trial.

■■ Initially, we believe it was error to allow the extended inquiry by plaintiff into the post-accident events relative to the police contacting Coleman concerning the accident. In a pretrial motion *in limine* it was ordered that:

> "[A]ll parties and their counsel are instructed not to mention, refer to, interrogate concerning, or attempt to convey to the jury in any manner, either directly or indirectly, that the defendant Richard Coleman received a traffic ticket or was charged with leaving the scene of an accident, without first obtaining the permission of this court outside the presence and hearing of the jury."

Yet, during trial, plaintiff's counsel asked Coleman:

> "Q. Did the police finally get in touch with you?
>
> A. Yes—well not exactly. I got in touch with them.
>
> Q. You contacted the police?
>
> A. Yes.
>
> Q. Isn't it true that the police came to your foreman and said that they had a report that a Bell Telephone vehicle was involved in a hit and run and it had hit a child and ran from the scene, isn't that true?"

Although this last question could be excused in light of the prior line of questioning and the attendant responses, we feel the whole inquiry was erroneous—first, because it appears to have violated the *in limine* order in spirit, if not in fact, and second, because the evidence of the police contact with Coleman was irrelevant to the issues in this case.

Coleman and Bell also argue that it was improper to admit testimony concerning the post-accident investigation in which a "red mark" was discovered on the left front tire of the Bell vehicle. Plaintiff introduced this testimony to prove that the Bell car actually ran over his leg.

■■■ "A fact cannot be established by circumstantial evidence unless the circumstances are of a nature and so related to each other that it is the only conclusion that can be drawn therefrom, and mere conjecture, guess or suspicion is insufficient." (*Coulson v. Discerns*, 329 Ill.App. 28, 32, 66 N.E.2d 728, 730.) This "red mark" was never identified as blood nor was it connected with the accident. Using this "red mark" to show contact between the Bell car and plaintiff's leg would therefore be based solely on conjecture and guess. Furthermore, testimony based on an inspection after the event is not competent unless evidence is also introduced to show that the conditions inspected (*i.e.*, the tire and the "red mark") existed and remained unchanged between the event and the

inspection. (*La Salle National Bank v. Feldman,* 78 Ill.App.2d 363, 372, 223 N.E.2d 180, 185.) No such showing of unchanged conditions was made. Therefore, admission of the testimony concerning the "red mark," as adduced, was improper.

Secondly, we believe it was improper to compel Coleman to comment on the statements of other witnesses. While it is true that statements of others may be shown a witness to refresh that witness's recollection, they may not be used to impeach that witness. The rule as stated in *People v. Krauser,* 315 Ill. 485, 508, 146 N.E. 593, 602, and cited with approval in *Adamaitis v. Hesser, supra,* is that:

> "[A] witness can testify only to such facts as are within his knowledge and recollection, but he is permitted to refresh and assist his memory by the use of a written instrument, memorandum or entry in a book, and it is not necessary that the writing should have been made by the witness himself or that it should have been an original writing, provided that after inspecting the record he can speak to the facts from his own recollection."

Here, over objection, counsel for plaintiff was permitted to cross-examine Richard Coleman about a statement made by William Bailey. Coleman was placed in a bad light by being required to comment on the alleged inconsistencies between his testimony and Bailey's statement. He seemingly was being contradicted by his own fellow employee and appeared hard-pressed to produce spontaneous explanations. Such a tactic places the witness in the position of being the judge of the veracity of another witness—a matter exclusively within the province of the jury. (*Ryan v. Monson,* 33 Ill.App.2d 406, 179 N.E.2d 449; *Teece v. Bieber,* 323 Ill.App. 647, 56 N.E.2d 665.) Here, the use of the statements was not to refresh Coleman's recollection but to impeach him. As such, it was error.

● 7 Thirdly, we think it was error to permit McAlister to state his conclusion on Coleman's ability to avoid the accident and to permit counsel for plaintiff to comment on that conclusion. During cross-examination of McAlister, an attempt was made to impeach him by pointing out the difficulty he would have in viewing the left front tire of the Bell vehicle make contact with plaintiff, because McAlister testified that he was near the northwest corner at the time the westbound car passed him. The car, according to McAlister, was traveling at 30 m.p.h. and struck plaintiff some two to three car lengths west of the intersection. McAlister stated he ran out into the intersection after the Bell vehicle passed and was thus able to view the left side of the Bell vehicle. Thus, on cross-examination, the following colloquy occurred.

"Q. What did she [Mrs. Knasiak] do?

A. I couldn't tell you what she did because as soon as she hit the car [*sic*], then the Bell Telephone car went off.

Q. Right close together?

A. Yes, right, very little time elapsed.

Q. In fact you didn't have time to do anything?

A. Yes, it could have been avoided. The second accident could have been avoided.

Mr. Butts: I move that the witness' comments be stricken as not responsive.

Mr. Postilion: I resist the motion.

Mr. Butts: They are not responsive to my question.

Mr. Postilion: I will resist the motion. They are totally responsive.

The Court: I will let it stand."

On redirect examination of McAlister, the following exchange occurred:

"Q. Mr. McAlister, the lawyer just asked you something, and your answer was that the Illinois Bell car could have avoided this accident?

A. Yes.

Q. How?

Mr. Butts: Objection, your Honor, That calls for a conclusion. That is for the Jury's decision.

Mr. Postilion: The door was opened.

The Court: Overruled.

Mr. Postilion: Q. How could the Illinois Bell have avoided this accident?

A. By the time the Pontiac—I felt as a driver he should have noticed that, you know, if something is going on and before. I think he could have avoided it if he could have just turned, you know."

Finally, during rebuttal final argument, counsel stated:

"Counsel told us that Michael McAlister is inconsistent on the issue of Coleman. Counsel for Illinois Bell brought out from Michael McAlister the testimony that the accident could have been avoided by the Illinois Bell car.

Mr. Butts: Objection.

The Court: Overruled."

The witness's answer that the alleged second accident could have been avoided by proper lookout or turning the car did not respond to the question asked, and the court erred in refusing to strike the answer. *Tyler v. Tyler*, 401 Ill. 435, 82 N.E.2d 346; *Math v. Chicago City Ry. Co.*, 243 Ill. 114, 90 N.E. 235.

In addition to being unresponsive, McAlister's comment was incompetent since it improperly stated his conclusion on a crucial ultimate fact. *Loftus v. Chicago Rys. Co.*, 293 Ill. 475, 127, N.E. 654; *Brink's Chicago City Express Co. v. Kinnare*, 168 Ill. 643, 48 N.E. 446; *Ballard v. Jones*, 21 Ill.App.3d 496, 316 N.E.2d 281.

■■ Finally, it appears to us that error occurred in plaintiff's rebuttal final argument. There, it was stated:

> "You can break the femur by slipping and falling. You can break the bone after you hit the ground. You can be hit by some object like a car from the side. It would be rather unusual if you were to break a bone from behind, front to back. It is rather unusual. That is why we were surprised they used a plate and screw. We find now what is unusual, That the artery that rides behind the bone is severed at that site and that the leg has taken a front to back trauma, a front to back blow."

At trial, the only evidence in this regard was the testimony of Dr. Gleason that the femoral artery "runs on the inner aspect of this hip, and then gradually passes, medially and posteriorly, to the femur." The doctor was never asked if the severing of the artery could only be caused by a front-to-back blow. Although in closing argument counsel may properly draw inferences from the evidence, he may not create his own evidence. *Vujovich v. Chicago Transit Authority*, 6 Ill.App.2d 115, 126 N.E.2d 731; *Wellner v. New York Life Ins. Co.*, 331 Ill.App. 360, 73 N.E.2d 156.

Here, the suggestion that the break could only be caused in a front-to-back blow was highly prejudicial. It had the effect of scientifically rebutting defendants' theory that the injury was caused by the impact of the first car striking plaintiff and supported plaintiff's theory that the injury occurred as the Bell car passed over plaintiff's leg while he lay in the street on his back, *i.e.*, an impact to the front of the leg. Such a statement of fact by counsel, unsupported by the record, is improper. (*Jackson v. National Dairy Products Corp.*, 32 Ill.App.2d 37, 176 N.E.2d 551; *Vujovich v. Chicago Transit Authority*, supra.) Here, we believe it was prejudicial, since it supplied the medical corroboration of plaintiff's theory. Without that statement, it would have been difficult for the jury to comprehend how the left femur could be injured by the Bell car without any injury to the right leg. The evidence indicated plaintiff was lying with his legs to the north and his head to the south. The westbound Bell vehicle would have had to pass over the right leg to strike the left femur midway between the knee and hip. It is true that the evidence is somewhat conflicting as to whether the boy was lying still or "thrashing about" after the first impact. Perhaps this "thrashing about" placed him

in such a position that it was possible for the Bell vehicle to strike Melvin that high on the left leg without making any contact with the right leg. However, such a theory is controverted to the extent that the only direct evidence as to the position of plaintiff after the first impact was that his legs were to the north and his head to the south. In this context, the medical corroboration supplied by counsel was unsupported by the record.

Although we have found here that there was a question of fact for the jury's consideration as to whether the conduct of Bell and Coleman was a proximate cause of plaintiff's injuries, we are also of the belief it was a close question the jury might have determined either way and, as a consequence, it was important that the jury not be influenced by any conduct so prejudicial as to deprive either party of a fair trial. As stated in *Jacobson v. National Dairy Products Corp.*, 32 Ill.App.2d 37, 43, 176 N.E.2d 551, 554:

> "Where the liability is sufficiently close so that the jury might reasonably have returned a verdict for either party, the trial must be conducted in an orderly manner so that the jury will not be improperly influenced."

See also *Bulleri v. Chicago Transit Authority, supra.*

From our review of the entire record, we are of the opinion that the accumulation of errors, as set forth herein, prejudiced the rights of defendants Coleman and Bell so that they are entitled to a new trial. *Jacobson v. National Dairy Products Corp., supra; Bulleri v. Chicago Transit Authority, supra.*

### III.

Since this matter must be remanded for a new trial, it is necessary that we consider the contention of defendants with regard to the failure of the trial court to conduct hearings as to the competency of the minor witnesses.

The record discloses that 6 months prior to trial, a hearing was held by a motion judge in the trial court to determine the competency of James and Jerry Champion, ages 13 and 15 respectively, to give discovery depositions. They were both held to be competent, and they were the same ages at the time of trial when the court denied requests for hearings as to their competency.

■■ In this State, every person who is 14 years old or older is presumed competent to testify. (*People v. Karpovich*, 288 Ill. 268, 123 N.E. 324.) Competency is determined as of the time the witness is offered at the trial. (*Knab v. Alden's Irving Park, Inc.*, 49 Ill.App.2d 371, 199 N.E.2d 815.) When a child under the age of 14 is called as a witness, the court should first determine the child's competency as a witness. (*People v.*

*Crews*, 38 Ill.2d 331, 231 N.E.2d 451; *People v. Johnson*, 298 Ill. 52, 131 N.E. 149.) To do this, the judge should hold a preliminary inquiry into competency by examining the child's intelligence, understanding and moral sense. (*People v. Davis*, 10 Ill.2d 430, 140 N.E.2d 675; *People v. Crowe*, 390 Ill. 294, 61 N.E.2d 348.) If the child is mature enough to have correct impressions from his senses and to recall and narrate them in a reasonably intelligent manner and appears to appreciate the moral duty to tell the truth, the child is competent to testify. *People v. Ballinger*, 36 Ill.2d 620, 225 N.E.2d 10.

Here, the minor witnesses were 13 and 15 years of age at the time of trial in November, 1973, from which it appears that both will be 14 years or older before this case is retried, so that they will be presumed competent. However, if it should develop that one may be under the age of 14 years, the better practice would be for the court to make a preliminary interrogation to determine competency to testify. *People v. Dilworth*, 67 Ill.App.2d 384, 214 N.E.2d 9.

The judgment is reversed and remanded for a new trial.

Reversed and remanded.

DRUCKER and LORENZ, JJ., concur.