110 F.3d 508
 46 Fed. R. Evid. Serv. 1081, Prod.Liab.Rep. (CCH) P 14,918
Jessica WINTZ, a minor By and Through her next friends, Van
WINTZ and Jill C. Wintz, Jill C. Wintz,
Individually, and Van Wintz,
Individually, Plaintiffs-Appellants,
v.
NORTHROP CORPORATION and Eastman Kodak Company, Defendants-Appellees.
 No. 96-1161.
 United States Court of Appeals,Seventh Circuit.
 Argued Sept. 19, 1996.
Decided April 4, 1997.
 
 Paul W. Grauer (argued), Randall W. Graff, Grauer & Associates, Schaumburg, IL, for Jessica Wintz, Jill C. Wintz, Van Wintz.
 David L. Doyle, Thomas P. Cimino, Jr., Vedder, Price, Kaufman & Kammholz, Chicago, IL, for Northrop Corporation.
 Mark A. Brand (argued), James T. Hultquist, Brand & Novak, Chicago, IL, for Eastman Kodak Company.
 Before COFFEY, FLAUM and MANION, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 Plaintiffs-appellants Van Wintz and Jill Wintz, both individually and on behalf of their daughter Jessica (the "Wintzes"), appeal the district court's order granting the jointly-filed motion for summary judgment of defendants-appellees Northrop Corporation ("Northrop") and Eastman Kodak Company ("Kodak"). The Wintzes sought damages for injuries allegedly suffered by Jessica as a result of her in utero exposure to the chemical bromide, allegedly contained in photographic developing material manufactured by Kodak and used by Jill Wintz in the course of her employment with Northrop. The questions presented are whether the district court erred in excluding the proffered testimony of a toxicologist hired by the Wintzes, and whether, absent that testimony, the Wintzes failed to establish a genuine issue of fact as to whether exposure to bromide caused injury to Jessica. We affirm.
 
 I. Background
 
 2
 Prior to and during her pregnancy with Jessica, Jill Wintz was employed by Northrop as an Industrial Engineer Associate in Northrop's Defense Systems Division. Her employment with Northrop began in May 1979, and continued through March 1982. From March 1980 through October 1980, while she was pregnant, Jill's duties involved the mixing of certain chemicals manufactured by Kodak to develop photographic film used in the manufacturing process of the "black box" for jet fighter aircraft. One of these chemicals, Kodalith Developer B, contained bromide. The chemicals came in powdered form in paper-type bags, and Jill poured them from the bag into a container for mixing with water. During this process, the powder from the bags would create a dust in the air, and Jill alleges that she inhaled this dust while mixing the chemicals. According to Jill's affidavit, she was "never given or advised to use any type of protective breathing mask or other protective equipment during mixing or use of the chemical powders." Jill Wintz worked in this capacity for Northrop from March 1980 until she took a maternity leave of absence on October 31, 1980, approximately five weeks before giving birth to Jessica, and she mixed the chemicals on a daily basis during this period.
 
 
 3
 Jessica was born at Lutheran General Hospital in Park Ridge, Illinois on December 6, 1980, and shortly thereafter she began displaying a number of atypical symptoms for newborns. Most noticeably, according to the deposition of Dr. Henry Mangurten, a neonatologist who treated Jessica at that time, she displayed hypotonia (low muscle tone), poor sucking reflexes, and weak or infrequent cry, as well as abnormal facial features. When she was but four days old, the baby was placed in a neonatal intensive care unit and came under Dr. Mangurten's care. In an effort to determine the cause of these abnormal behavioral symptoms, Dr. Mangurten ordered a variety of tests but they came back inconclusive, at which time the specialist saw fit to interview and gain additional background information from Jill Wintz. Upon learning that Jill worked in an environment in which bromide was present, Dr. Mangurten, based on his previous experience in which he had treated a baby with elevated bromide levels and who had displayed symptoms similar to Jessica's, ordered a bromide test on the baby. A urine sample was obtained when she was 11 days old and prior to learning the results of this test, Jessica's condition showed signs of improvement and she was released from the neonatal intensive care unit when she was but 13 days old. Shortly thereafter, the test revealed elevated levels of bromide in Jessica's system. The doctor, at this time, ordered another urine sample taken when Jessica was 20 days old and this test again revealed the presence of bromide in her system but at a decreased level. This time, Dr. Mangurten also ordered a bromide test on her mother, Jill, which also revealed elevated bromide levels in her system as well.
 
 
 4
 Dr. Mangurten stated that Jessica's condition had improved somewhat, though not entirely, at the time she was released from the neonatal intensive care unit. According to Dr. Mangurten, Jessica's condition was tracked for roughly four years after she left Lutheran General pursuant to a follow-up program the hospital maintains for infants who have spent time in the neonatal intensive care unit. In an affidavit, Dr. Barbara Burton, Director for the Center of Medical and Reproductive Genetics at Michael Reese Hospital in Chicago, who reviewed Jessica's complete medical records, stated that Jessica has continued to display abnormal symptoms through the present, including strabismus (deviation of the eye), myopia, frequent upper respiratory infections, enamel defects in her teeth, and delayed development in mental and physical milestones. Dr. Burton, who is an expert in genetics and genetic disorders, opined in her affidavit that Jessica's symptoms are all "classical" symptoms of a person afflicted with a genetic disorder known as Prader-Willi Syndrome ("PWS").[1]
 
 
 5
 In the course of her follow-up care after being discharged, it was learned (and is not disputed by the Wintzes) that Jessica was in fact born with PWS. PWS is caused by a deletion of genetic material from the father's chromosomes. It is a purely genetic disorder which occurs prior to conception, and it cannot be caused by environmental exposure.[2] As the Wintzes have acknowledged, all of the abnormal symptoms Jessica has experienced throughout her life are very similar, if not identical, to those experienced by children with PWS. During his deposition, Dr. Mangurten agreed with the statement that Jessica's developmental problems have "almost certainly" been caused by PWS.
 
 
 6
 In addition to Dr. Mangurten, the Wintzes listed Gilbert Elenbogen ("Elenbogen"), a toxicologist, as an expert witness.[3] The Wintzes asserted that Elenbogen would testify that exposure to bromide caused Jessica's abnormalities. Elenbogen opined in an affidavit that Jill Wintz's exposure to bromide while mixing the photographic chemicals caused Jessica to be exposed to bromide, and that this exposure, as stated in Elenbogen's affidavit, "caused the child's symptoms at birth and her permanent developmental damage and problems." Elenbogen did acknowledge that Jessica had PWS, and that her symptoms which he attributed to her prenatal exposure to bromide were identical to those caused by PWS. No other expert testified for the Wintzes on the issue of causation.
 
 
 7
 Kodak and Northrop filed a combined motion for summary judgment after deposing Elenbogen and Mangurten. They argued that Elenbogen's testimony was inadmissible under Rule 702 of the Federal Rules of Evidence as interpreted by the Supreme Court in Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). They argued that the toxicologist Elenbogen was not a licensed physician and surgeon and lacked sufficient experience with bromide or with PWS, and was thus not qualified to render an opinion as an expert as to the cause of Jessica's injuries. Northrop and Kodak further argued that, because Elenbogen's opinion that bromide caused Jessica's injuries was inadmissible due to his lack of qualifications, and because Dr. Mangurten agreed in his deposition testimony that PWS was the cause of Jessica's developmental problems, the Wintzes failed to establish a genuine issue of material fact as to whether bromide exposure was a proximate cause of any of Jessica's abnormalities. In a memorandum opinion dated December 21, 1995, 1995 WL 758114, the district judge agreed with Kodak and Northrop. The district court entered a summary judgment order in favor of Kodak and Northrop on December 21, and the Wintzes appealed.
 
 II. Discussion
 A. Standard of Review
 
 8
 Under Illinois law (which the parties agree is applicable to this diversity case), the Wintzes bore the burden of establishing the essential elements of their claim, including proximate cause. See Korando v. Uniroyal Goodrich Tire Co., 159 Ill.2d 335, 202 Ill.Dec. 284, 288-89, 637 N.E.2d 1020, 1024-25 (1994). Thus, summary judgment in favor of Kodak and Northrop was proper if the Wintzes failed to designate evidentiary materials sufficient to demonstrate the existence of a genuine issue of fact as to any essential element of their claim, including proximate causation. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); see generally Porter v. Whitehall Laboratories, Inc., 9 F.3d 607, 612 (7th Cir.1993).[4] We review de novo the district court's grant of summary judgment. Porter, 9 F.3d at 612.
 
 
 9
 Trial judges enjoy wide latitude and discretion when determining whether to admit expert testimony, and the district court's decision concerning admissibility of such testimony (provided it follows the Daubert methodology) will not be disturbed unless "manifestly erroneous." Bradley v. Brown, 42 F.3d 434, 436-37 (7th Cir.1994) (citing Cella v. United States, 998 F.2d 418, 423 (7th Cir.1993)). Thus, in reviewing the district judge's disposition of this case, initially we consider under the deferential "manifestly erroneous" standard whether the exclusion of Elenbogen's proffered testimony was proper. If the ruling excluding Elenbogen's testimony was proper, we then focus our de novo review of the grant of summary judgment on whether the remaining competent evidence of causation (Dr. Mangurten's testimony, in this case), was sufficient to create a genuine issue fact on the causation issue.
 
 
 10
 B. Elenbogen's Proffered Testimony on the Issue of Proximate Causation
 
 
 11
 The admissibility of expert testimony in federal court proceedings is governed by Federal Rule of Evidence 702, as interpreted by the Supreme Court in Daubert. The text of Rule 702 provides:
 
 
 12
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 13
 In Daubert, the Supreme Court held that Rule 702 requires the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. at 2795. Focusing on the language of the Rule, the Court concluded that proffered expert testimony must be "derived by the scientific method," and must "fit" the case, in that it will assist the trier of fact in understanding the issues. Id. at 590-91, 113 S.Ct. at 2795-96.
 
 
 14
 Our case law interpreting Daubert has established that, when evaluating the admissibility of proffered expert testimony, district courts are to undertake a two-step methodology. First, the district court must "consider whether the testimony has been subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.' " Deimer v. Cincinnati Sub-Zero Products, Inc., 58 F.3d 341, 344 (7th Cir.1995) (quoting Porter, 9 F.3d at 614). Second, the district court must " 'determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue.' " Id.
 
 
 15
 In this case, the district judge employed the two-step test outlined in our case law and concluded that the toxicologist Elenbogen's proffered testimony failed to satisfy either of the two prerequisites. The judge concluded that Elenbogen's opinions as to causation were "speculative in nature and lacking in scientific reliability." D.Ct.Op. at 6. The district judge also concluded that, even assuming that Elenbogen's methodology in reaching those conclusions was proper, his testimony would not be helpful to the trier of fact, since Elenbogen, who is neither a licensed physician nor a surgeon, lacked sufficient expertise in PWS, birth defects, or bromide exposure, to qualify him to offer an expert opinion as to the cause of Jessica's abnormalities. We agree with the district court.
 
 
 16
 Elenbogen's general qualification as a toxicologist derived primarily from his master's degrees in chemistry and environmental engineering, and from his experience as a research chemist. Elenbogen's experience as an expert witness in toxicology cases was based to a considerable extent on his expert testimony in drunk driving cases. Indeed, roughly 30-40% of the cases in which he had testified involved drunk driving. Elenbogen admitted that, as he is not a medical doctor, he does not interpret clinical symptoms exhibited by patients and bring to bear medical experience to formulate a diagnosis. Instead, he relies on licensed medical practitioners to formulate a diagnosis before he attempts to correlate that diagnosis with the potential effects of a toxic substance.
 
 
 17
 In forming his opinion in this case that Jill Wintz's exposure to bromide while pregnant with Jessica caused Jessica's abnormalities, Elenbogen relied on a review of articles pertaining to bromide, as well as testing by an outside lab of a sample of the chemicals with which Jill Wintz worked. At the time he formed his opinion, he had neither seen nor spoken with Jill Wintz or Jessica Wintz or reviewed Jessica's medical records. He did not perform any tests or calculations concerning the amount of exposure to bromide Jill Wintz had, nor did he seek any information concerning the work environment in which Jill Wintz was exposed to bromide. Basically, as the district court aptly noted, it was only after he had concluded that bromide exposure caused Jessica's symptoms that he examined information specific to Jill Wintz's exposure.
 
 
 18
 The Federal Judicial Center's Reference Manual on Scientific Evidence (1994), in its chapter entitled "Reference Guide on Toxicology," notes that the following three "preliminary assessments" should be made by an expert toxicologist as premises for an opinion:
 
 
 19
 First, the toxicologist should analyze whether the disease can be related to chemical exposure by a biologically plausible theory. Second, the expert should examine if the plaintiff was exposed to the chemical in a manner that can lead to absorption into the body. Finally, the expert should offer an opinion as to whether the dose to which the plaintiff was exposed is sufficient to cause the disease.
 
 
 20
 Elenbogen's experience, knowledge, and methodology simply were not sufficient to permit him to offer an expert opinion applying the principles of toxicology to a human being in this case. As stated, at the time he formed his opinion, Elenbogen knew only that Jill Wintz had worked with a chemical which contained bromide, and that Jessica had suffered certain symptoms he found to be consistent with bromide exposure. He did not know how frequently, in what quantity, or in what form, Jill Wintz was exposed to bromide on the job. He did not know the specifics of the work environment (i.e., the size of the room, the ventilation capacity if any, whether Jill wore a mask or what type of mask she wore if any), nor did he attempt to correlate any specific dose Jill received with Jessica's symptoms. Elenbogen did (after his first of two depositions) perform a half-life calculation[5] to determine how much bromide would have been in Jessica's system at the time Jill terminated her employment with Northrop, based on the levels measured after she was born. The calculation suggested, however, that if Jessica's bromide exposure came about solely on account of Jill's workplace exposure, Jessica would have had a dose of bromide in her system almost twice the lethal dose of bromide at the time Jill left Northrop. This finding hardly supports the conclusion that Elenbogen was qualified to testify that Jill's workplace exposure caused Jessica's abnormalities, since it would suggest that, if Jill's workplace exposure to bromide had occurred in the manner Elenbogen believed, Jessica's prenatal exposure to bromide would have resulted in the infant's death, as opposed to birth defects.
 
 
 21
 Thus, as the district court concluded, Elenbogen's methodology in attempting to relate the general principles of toxicology and bromide exposure to the facts of this case appears to have been based less on a scientific understanding of the specifics of Jill Wintz's workplace exposure and the potential effects on Jessica, and more on merely a general understanding of bromide, with only unsupported speculation having been used to relate the general knowledge to the facts surrounding Jill Wintz's exposure. At a minimum, it was not manifestly erroneous for the district court to conclude that, despite Elenbogen's general qualification as a toxicologist, his proffered testimony as to proximate causation in this case was not sufficiently based on scientific methodology to be admissible. See 3 Jack B. Weinstein, et al., Weinstein's Evidence para. 702, at 702-61 ("Just as the wrong title may mean that the witness is nevertheless qualified, the right title will not suffice if the witness does not have the qualifications required by the facts of the case.").
 
 
 22
 The Wintzes cite to Sanfelice v. Dominick's Finer Foods, 1995 WL 608602 (N.D.Ill.1995), in support of their argument that Elenbogen had sufficient knowledge to qualify as an expert. Sanfelice, however, provides no support for the Wintzes' argument. The defendant in that case objected to the testimony of a psychotherapist, on the ground that he did not have a degree in psychology. The district court in that case, however, noted that the expert had ample practical experience, since he had been seeing patients on a daily basis to administer therapy and counseling for decades. The district court in Sanfelice concluded that any weakness in the psychotherapist's educational knowledge and experience could be brought out on cross-examination. Here, by contrast, it is precisely Elenbogen's lack of experience--with bromide, with PWS, and with birth defects in general (which was brought out during his deposition)--that leads us to conclude, as did the trial court, that notwithstanding his general qualification as a toxicologist, Elenbogen did not possess sufficient expertise or knowledge as to the relevant medical question dealing with the proximate cause of Jessica's injuries to assist the trier of fact in understanding the case. See Wilson v. City of Chicago, 6 F.3d 1233 (7th Cir.1993) (proffered expert testimony of pathologist inadmissible with respect to plaintiff's allegation of torture, notwithstanding pathologist's expertise in pathology issues and "serious avocation" in medical torture issues); see also Deimer v. Cincinnati Sub-Zero Products, 58 F.3d 341, 345 (7th Cir. 1995) (Expert testimony excluded where expert "did not have the requisite experience" to apply analysis to facts of the case). In sum, we conclude that the district court's decision excluding Elenbogen's testimony was not manifestly erroneous.
 
 
 23
 C. The Testimony of Dr. Mangurten as to Causation
 
 
 24
 Having determined that the district court did not err in excluding Elenbogen's proffered expert testimony, we consider whether the district court properly concluded that Dr. Mangurten's testimony, standing alone, was insufficient to create an issue of fact as to causation. We agree with district judge and conclude that it did not.
 
 
 25
 Throughout their briefs and during oral argument, the Wintzes have sought to distinguish between the "short-term" and "long-term" symptoms Jessica has suffered. The "short-term" symptoms refer to manifestations of pediatric medical problems such as hypotonia, poor sucking reflexes, and weak or infrequent cry, which resulted in Jessica's temporary placement in the neonatal intensive care unit. The "long-term" symptoms refer to the general developmental difficulties Jessica has encountered throughout her life. We will address each separately.
 
 
 26
 With respect to the long-term symptoms, the Wintzes acknowledge that Dr. Mangurten, in his deposition, agreed that Jessica's "developmental problems are almost certainly caused by the fact that she has [PWS]." They assert, however, that Dr. Mangurten did not "rule out" bromism as a cause of Jessica's developmental problems, and that Jessica's PWS is only relevant with respect to the measure of damages for which she could recover. This argument simply ignores the Wintzes' burden of proof as to this element of their claim.
 
 
 27
 Under Illinois law, "[p]roximate cause can only be established when there is a reasonable certainty that the defendant's acts caused the injury." Schultz v. Hennessy Industries, 222 Ill.App.3d 532, 165 Ill.Dec. 56, 62, 584 N.E.2d 235, 241 (1991). Even assuming that Dr. Mangurten's agreement with the statement that PWS "almost certainly" caused Jessica's developmental problems did not amount to a "ruling out" of bromism as a cause of Jessica's developmental problems (though it seems to us that it comes quite close to doing just that), it was incumbent on the Wintzes, as the party with the burden of proof, to come forward with convincing affirmative evidence that exposure to bromide caused Jessica's abnormalities in order to survive summary judgment. See id. (citing Lindenmier v. City of Rockford, 156 Ill.App.3d 76, 108 Ill.Dec. 624, 630, 508 N.E.2d 1201, 1207 (1987)) ("The concept of proximate cause is the same in both cases of negligence and strict liability in tort, and liability cannot be predicated upon speculation, surmise, or conjecture."); see also Zimmer v. Celotex Corp., 192 Ill.App.3d 1088, 140 Ill.Dec. 230, 232, 549 N.E.2d 881, 883 (1989) ("[L]iability cannot be based on mere speculation, guess, or conjecture."). Whether Dr. Mangurten "ruled out" bromism as a cause of Jessica's long-term developmental problems is irrelevant--the fact that he at no point testified or indicated that bromism was the cause of those developmental problems, considered in light of the fact that his was the only evidence of causation presented (other than the properly-excluded testimony of Elenbogen), compels the conclusion that the trial court's grant of summary judgment with respect to Jessica's long-term developmental problems was proper.
 
 
 28
 As to the short-term symptoms, the Wintzes have pointed to Dr. Mangurten's deposition testimony where he stated that, since Jessica's symptoms decreased as the level of bromide in her body decreased, he felt there was a "suggestion" that the clinical observations of Jessica's difficulties were "related" to the bromide levels. However, on cross-examination, Dr. Mangurten admitted the following:
 
 
 29
 Q. Now, let me ask you this question. Again, on your suggestion comment, can you say with any reasonable degree of medical or scientific certainty as opposed to we don't really know, that any [b]romide in Jessica Wintz at any time has caused any of her developmental problems? Can you say that with certainty?
 
 
 30
 A. Not with certainty, no.
 
 
 31
 Under Illinois law, to serve as the sole basis for a conclusion that an act was the proximate cause of the plaintiff's injury, an expert must be able to testify with a reasonable degree of medical certainty that proximate cause existed. Scholle v. Continental Nat'l Am. Group, 44 Ill.App.3d 716, 3 Ill.Dec. 350, 355, 358 N.E.2d 893, 898 (1976) (citing Sommers v. American Economy Ins. Co., 8 Ill.App.3d 450, 289 N.E.2d 712 (1972)). In light of Dr. Mangurten's statement on cross-examination that he was not stating with any degree of medical certainty that Jessica's problems had "at any time" been caused by bromide, we conclude that his equivocal statement during direct that there was a "suggestion" that the symptoms were "related" to bromide is insufficient, standing alone, to raise an issue of fact as to proximate causation of Jessica's short-term problems.
 
 
 32
 The Wintzes direct us to Champion v. Knasiak, 25 Ill.App.3d 192, 323 N.E.2d 62 (1974), and argue that it supports the proposition that "Illinois courts have recognized that there may be more than one cause of a particular injury, and that a pre-existing condition does not preclude a negligence action." Br. of Appellant at 23. We, however, find no such proposition in Champion. In that case, a boy riding a bicycle was struck by an automobile, and was thrown into the opposite lane, where he was believed to have been struck by a second vehicle. The testimony as to whether he was in fact struck by the second vehicle, however, was disputed. The driver of the second vehicle denied having hit the boy, and the testimony of various witnesses was inconsistent as to whether any impact between the second car and the boy occurred.
 
 
 33
 After judgment was entered for the plaintiff, the driver of the second car appealed, arguing that the plaintiff had failed to prove that the second car was the proximate cause of any injury suffered by the boy, and that the trial court should have granted his motion for a directed verdict. 323 N.E.2d at 68. The court concluded that, based on the testimony, there was adequate evidence that the second car had (negligently) struck the boy to allow the case to go to the jury, and upheld the jury award which had been entered for the plaintiff.
 
 
 34
 We do not agree with the Wintzes that the Champion court's one-paragraph analysis of this relatively straightforward proposition provides any support for the Wintzes' claim in this case. Champion addressed a situation in which the conflicting testimony of eyewitnesses was presented, and the court ruled that the resolution of those conflicts presented a jury question. In the present case, Dr. Mangurten's deposition established in clear and unequivocal language that, in his opinion, PWS caused Jessica's long-term developmental problems. It also established that he could not offer an opinion with any reasonable degree of medical certainty that Jessica's short-term problems at birth were caused by bromide, notwithstanding the observation that her symptoms decreased at the same time the bromide levels decreased. Whatever support the Wintzes hope to find in Champion, we do not agree that it can be read to suggest that they did not have the obligation to come forward with affirmative evidence to support their causation argument. Thus, the trial court did not err in concluding that Dr. Mangurten's testimony was insufficient to create a genuine issue of fact as to whether bromide caused any of Jessica's long-term or short-term symptoms.
 
 
 35
 The district court's decision excluding the proffered testimony of the Wintzes' toxicologist was not manifestly erroneous, and the evidence, when considered in its totality, fell short of raising a genuine issue of material fact as to the cause of Jessica's short-term or long-term symptoms. We AFFIRM the grant of summary judgment in favor of Kodak and Northrop.
 
 
 
 [1]
 Prader-Willi Syndrome is defined as "a congenital disorder characterized by rounded face, almond-shaped eyes, strabismus, low forehead, hypogonadism, hypotomia, insatiable appetite, early hypotonia, failure to thrive, and mental retardation." Dorland's Illustrated Medical Dictionary 1638 (28th ed. 1994)
 
 
 [2]
 This was established through the affidavit of Dr. Burton and is not disputed by the Wintzes on appeal
 
 
 [3]
 Elenbogen's resume states that he is a "board certified toxicologist," and during his deposition, Elenbogen indicated that he is certified by the American Board of Toxicology. It is not clear from the record whether Elenbogen has received formal certification or licensing of any kind from the State of Illinois
 
 
 [4]
 As this court recently noted in Mayer v. Gary Partners & Co., 29 F.3d 330 (7th Cir.1994), the federal summary judgment standard applies even when a federal court applies substantive state law in a diversity case. 29 F.3d at 335
 
 
 [5]
 A half-life calculation measures "the time required for half the amount of a substance (as a drug or radioactive tracer) in or introduced into a living system to be eliminated whether by excretion, metabolic decomposition, or other natural process." Webster's Third New International Dictionary 1022 (1981)