OPINION AND ORDER
 

 CRABB, District Judge.
 

 This is a product liability action in which plaintiffs are suing defendant Pittway Corporation, a manufacturer of smoke detectors and carbon monoxide detectors, and its successor, BRK Brands, Inc., alleging that detectors installed in their home did not sound timely alarms during a fire in which plaintiffs Shawn and Rachel Werner were injured. Shawn’s wife and Rachel’s mother, Linda Werner, died in the fire, as did Rachel’s younger sister, Sarah. Their estates are represented in this action by Terry Werner.
 

 Jurisdiction is present. The parties are of diverse citizenship and the amount in controversy exceeds $75,000.
 
 See
 
 28 U.S.C. § 1332(a)(1). (As legal representative of the estates of Linda and Sarah Werner, Terry Werner is held to have the same citizenship as the decedents.
 
 See
 
 § 1332(c)(2). Defendant National Guardian Life Insurance Company is a Wisconsin corporation; its citizenship is not diverse from plaintiffs but because it is sued only as a subrogated insurer it is considered a nominal defendant whose citizenship does not affect diversity.
 
 See, e.g., Shaw v. Dow Brands, Inc.,
 
 994 F.2d 364, 369 (7th Cir.1993) (citing 14A Charles Alan Wright, Arthur R. Miller, Edward E. Cooper,
 
 Federal Practice and Procedure
 
 § 3731 n. 10).)
 

 Plaintiffs assert claims of negligence and strict liability relating to the carbon monoxide detector, contending that defendants were negligent or are strictly liable for failings such as design, marketing, testing and warning. They assert the same claims of negligence and strict liability relating to the battery-powered ionization smoke detector allegedly in place in plaintiffs’ basement and the battery-powered ionization detector in plaintiffs’ bedroom hallway and they raise claims of fraudulent advertising with respect to both smoke detectors and the carbon monoxide detector.
 

 The case is before the court on defendants’ motion for summary judgment and on defendants’ motion for sanctions for spoliation of evidence. Defendants contend that the undisputed facts demonstrate as a matter of law that defendant BRK’s smoke detectors are not defective, that defendants are entitled to judgment as a matter of law with respect to plaintiffs’ claims about the carbon monoxide detector because the detector was not designed or sold to perform as a fire alarm, that defendants had no duty to warn consumers about performance standards, that plaintiffs cannot establish that the detectors are defective without producing the products, which have disappeared, that plaintiffs cannot establish causation and that plaintiffs cannot prove their claims of fraudulent advertising. Plaintiffs respond by asserting that disputed issues of fact preclude entry of summary judgment for defendants.
 

 I conclude that it is not necessary to decide any of the issues relating to the alleged design defects in the detectors or
 
 *1021
 
 the alleged failure of defendants to warn about the limitations of their detectors or to test them properly because plaintiffs cannot establish that any design defect, inadequate warning or improper marketing caused their injuries. (I will discuss some of the issues briefly, to indicate that plaintiffs’ problems of proof go beyond causation.) The undisputed facts are that plaintiffs Linda, Rachel and Sarah Werner were awake in time to escape from the house. Thus, they cannot show that any failure of a detector caused the injuries they suffered. Shawn Werner cannot show that his injuries are attributable to any failure in the detectors. His claims are based entirely on the premise that he was asleep in the basement when the fire broke out, but he lacks the evidence to support a jury finding to that effect. Without that threshold showing, he cannot tie defendants’ negligence or strict liability to his injuries. If he was sleeping with his wife in the master bedroom, as he testified was his regular habit, he would been awakened with the rest of his family and would have had time to leave the house. That he may have chosen to go into the basement rather than escaping outdoors is not a decision he can attribute to defendants. Only if he was asleep in the basement can he claim that the failure of the detectors led to his injuries. Unfortunately for him, there is no way of knowing where he was at the crucial time. He remembers nothing of the fire or of the events leading up to it and he has no evidence that would resolve the question.
 

 I. THE PARTIES’ PROPOSED FINDINGS OF FACT
 

 A review of plaintiffs’ and defendants’ proposed findings of fact and responses to each other’s proposed findings reveals that both sides failed to comply with this court’s
 
 Procedures to be Followed on Motions for Summary Judgment,
 
 a copy of which was given to each party with the Preliminary Pretrial Conference Order on April 15, 1999. First, the parties have failed to support all of their proposals with cites to record evidence. The most significant problem stems from defendants’ submission of four volumes consisting of a hodgepodge of 77 exhibits in support of their proposed findings and lacking an index or a table of contents. Many of defendants’ proposed findings rely on exhibits from this compilation that cannot be used by the court because they have not been “properly made a part of an affidavit.”
 
 See
 
 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane,
 
 Federal Practice and Procedure
 
 § 2722, at 379;
 
 see also Procedures,
 
 1(E) (“Only depositions, answers to interrogatories, admissions on file, including admissions made in an answer or other pleading, and affidavits may be cited in support of proposed facts.”) Rule 56(e) requires that “[sjworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.” The following is a sampling of the improper exhibits that have not been authenticated or supported by an affidavit.
 

 • Defendants’ exhibit # 37, which is an investigative report of the fire from the Wisconsin Department of Justice.
 
 See, e.g.,
 
 Defs.’ Proposed Findings of Fact 158, 183,184 and 185.
 

 • Defendants’ exhibit #42, which is a statement Rachel Werner allegedly made to her aunt following the fire.
 
 See, e.g.,
 
 Defs.’ Proposed Findings of Fact #271.
 

 • Defendants’ exhibit # 44, which is a time line of the night of the fire.
 
 See, e.g.,
 
 Defs.’ Proposed Findings of Fact 177,178 and 182.
 

 • Defendants’ exhibit # 59, which is a picture of an unidentified carbon monoxide detector,
 
 see, e.g.,
 
 Defs.’ Proposed Findings of Fact # 247, and defendants’ exhibit # 38, which is alleged to be a photograph of plaintiffs’ house,
 
 see, e.g.,
 
 Defs.’ Proposed Findings of Fact # 277.
 

 Plaintiffs have failed to comply with Rule 56 by relying on an affidavit and accompanying report of David R. Purser
 
 *1022
 
 that is unsigned and unsworn,
 
 see, e.g.,
 
 Pltfs.’ Proposed Findings of Fact 24 and 48, as well as on an opinion from an Iowa state court on the defendants’ post judgment motions. Both parties rely improperly on affidavit, deposition and trial testimony from other cases. Such reliance is misplaced because evidence from
 
 other
 
 cases does not constitute record evidence in
 
 this
 
 case. Most problematic is that in support of plaintiffs’ proposed findings 55 through 122, plaintiffs cite trial testimony in an unrelated case in an Iowa state court. Although plaintiffs cite the transcript for the testimony of several different people, it is unclear from the pages plaintiffs have submitted who the witness is. Two other examples of improper citations to testimony from other cases follow.
 

 • Plaintiffs’ exhibit # 32, which is deposition testimony of David A. Minnis in another case
 
 (Gordon v. BRK Brands, Inc.). See
 
 Plotted.’s Resp. to Defs.’ Proposed Findings of Fact # 122.
 

 • An affidavit in
 
 Gilbert v. First Alert, Inc., see
 
 Plaintiffs’ proposals 140 and 141. Second, both plaintiffs and defendants
 

 fail to properly dispute some of their opponent’s proposals by failing to cite record evidence or failing to specify the nature of the disagreement.
 
 See, e.g.,
 
 Pltfs.’ Resp. to Defs.’ Proposed Findings of Fact # 149; Defs.’ Resp. to Pltfs.’ Proposed Findings of Fact # 27. Third, both sides set forth proposals that are not material facts. For example, in defendants’ proposed finding # 231, they state that “B. Don Russell, one of plaintiffs liability experts, opines that photoelectric detectors are superior in detecting certain types of fires.” This proposed fact does not support the proposition that photoelectric detectors are superior in detecting certain types of fires. It may be a “fact” that B. Don Russell did or thought something but it is not a fact material to the proposition.
 

 Finally, both parties have submitted portions of deposition transcripts in support of their proposed findings without filing the complete deposition transcript with the court. This is a violation of the court’s preliminary pretrial conference order.
 
 See
 
 dkt. #26 at 8 (“Depositions (preferably in compressed format)
 
 should
 
 be filed with the court promptly after preparation.”) It is difficult to discern the context of the deponents’ answers from the incomplete transcripts.
 

 In addition to the problems the parties have had in complying with the court’s procedures for the submission of proposed facts, both sides have referred liberally in their briefs to “facts” that were never made the subject of a proposed fact. (Compheating the picture is that many of these “facts” are misstatements of testimony or otherwise without foundation in the record.
 
 See
 
 discussion at Opinion, 1(A),
 
 infra.)
 
 The references to unsubstantiated facts weakens any persuasive effect their briefs might have.
 

 In making the following findings of material and undisputed fact, I have disregarded any proposals or responses that do not comply with this court’s summary judgment procedures and I have included only those facts material to the questions addressed in this opinion.
 

 II. UNDISPUTED FACTS
 

 A.
 
 Parties
 

 Plaintiffs Shawn Werner and Rachel Werner are Wisconsin citizens. Linda Werner and Sarah Werner were citizens of Wisconsin at the time they died. Defendant Pittway Corporation is a manufacturer of the detectors and BRK Brands, Inc., is its successor. Both are Delaware corporations with their principal places of business in Illinois. The citizenship of defendant-subrogee Golden Rule Insurance Company is not stated. It and defendant National Guardian Life Insurance Company, a Wisconsin corporation, are named pursuant to Wis. Stat. § 803.03 because both claim a subrogated interest as a result of payments made on behalf of plaintiffs. Defendant Pittway produced and sold residential smoke detectors through
 
 *1023
 
 its BRK Electronics division. It has not been involved in the residential smoke detector business since it sold selected assets of its BRK division in 1992.
 

 B.
 
 Smoke Detectors
 

 BRK’s smoke detectors use one of two basic types of technologies: ionization and photoelectric sensing chambers. An ionization detector uses a small amount of radioactive material to create charged air particles (ions) in the detection chamber. As smoke particles enter the chamber, they combine with the charged particles and neutralize them. This results in a reduction of electricity that is sensed by the detector’s electronic components, triggering an alarm. A photoelectric smoke detector uses a source of light in the detection chamber. When smoke enters the chamber, the smoke particles cause the light particles to reflect and scatter until they eventually hit a sensor, triggering an alarm.
 

 Ionization and photoelectric smoke detectors do not react the same way in all types of fires because of the different ways in which they sense the presence of smoke. An ionization detector may be more sensitive than a photoelectric detector to smoke from a flaming fire because such fires emit smoke consisting of small smoke particles while a photoelectric detector may be more sensitive to smoke from a smoldering fire because such fires emit smoke consisting of larger sized smoke particles.
 

 C.
 
 Carbon Monoxide Detectors
 

 The First Alert FACO carbon monoxide detector was designed to detect carbon monoxide in a residence in a non-fire situation and to alert people to dangerous levels of carbon monoxide. Carbon monoxide detectors were not designed for use as smoke detectors; rather, they were designed to detect carbon monoxide in a residence non-fire situation. Elevated temperatures and other gases from a fire affect the functioning of carbon monoxide detectors.
 

 D.
 
 Fire at the Werner Residence
 

 Shawn and Linda Werner lived in La Crosse, Wisconsin with their two daughters, Rachel and Sarah. They owned a one-story, three-bedroom residence with a finished basement. The front entrance to the home opened directly into the living room, on one side of which was a hallway connecting a bathroom and the three bedrooms. Directly opposite the front door was the dining room and to the left of that was the kitchen. Access to the basement was from the kitchen.
 

 In the early morning hours of January 27, 1996, a fire ignited in the basement of plaintiffs’ home. It began as a slow smoldering fire that had as its primary fuel source cellulosic materials or wood materials that produce copious amounts of carbon monoxide when subjected to combustion.
 

 At some point, Rachel was awakened and went out into the bedroom hallway where she met Linda and Sarah. There was smoke from the ceiling down to the level of Rachel’s waist. Linda, Sarah and Rachel walked past the front door and through the kitchen in an effort to find Shawn. While they were walking down the hall, Rachel heard a smoke detector. Linda opened the door to the basement and called twice for Shawn but received no response. When Linda opened the basement door, Rachel could not hear any sound in the basement. At that point the smoke had spread from the ceiling almost to the ground. Linda, Sarah and Rachel made their way back toward the bedroom area of the house, passing the front door of the house for a second time. Nothing blocked their access to the front door. Rachel went into the bathroom and linda and Sarah went into their respective bedrooms.
 

 Michael Crogan, the Werners’ next door neighbor and a volunteer fireman, came home that morning at approximately 12:50 a.m. He smelled smoke and walked toward plaintiffs’ house, where he saw smoke and a small flame at the dryer vent. He called 911 immediately to report the fire. He
 
 *1024
 
 then returned to plaintiffs’ house, opened the garage door and tried to attract attention by pounding on the entry way to the door leading to the house. When he received no answer, he went out the back door of the garage and started to pound on windows of the house. When he got to the bathroom window, he heard Rachel inside and pulled her from the house through the bathroom window. When Crogan broke the bathroom window, he saw heavy smoke.
 

 When the firefighters arrived at the house, they entered the house through the garage door and found Shawn Werner lying unconscious, partially on the landing and partially on the basement- stairs, with his head on the landing and his legs toward the basement. They pulled him from the house. One of the firefighters did not hear a smoke detector or carbon monoxide detector sounding as he entered the basement or while he searched the basement area. Some of the firefighters who entered the house heard an alarm and maybe more than one. The firefighters continued to search for Linda and Sarah, focusing their search in the basement. Linda and Sarah were found dead in close proximity to the front door by the fire chief, who had forced entry through the front door of the house. Shawn was in and out of consciousness from the time of the fire on January 27, 1996 until late April 1996 and he was discharged from the hospital in May 1996. He suffered extensive burns and permanent lung damage as a result of the fire and had numerous surgeries for his injuries. He has no memory of the fire or the events leading up to the fire.
 

 E.
 
 Detectors at the Werner Residence
 

 Whatever smoke and carbon monoxide detectors were installed within the plaintiffs’ home at the time of the fire have disappeared. The parties have no information about their whereabouts or who might have taken them.
 

 1.
 
 Smoke detectors
 

 There was a smoke detector in the basement of plaintiffs’ house that had been installed by the previous owner, Don Hopkins. When Shawn inspected the house in October of 1990, Hopkins pointed out the smoke detector in the basement and told him how to test it. At that time, Shawn noticed the words “First Alert” on the outside cover of the detector. Shawn does not know what type of sensing unit was in the basement smoke detector.
 

 In the fall of 1994, Shawn tested and changed the batteries in the basement smoke detector because Rachel brought home fire safety literature from school that recommended changing the batteries whenever the clocks were changed for daylight savings time. In the spring of 1995, Shawn tested the non-battery operated smoke detector on the first floor. At that time, he purchased two ionization smoke detectors for the bedroom hallway and the hallway between the kitchen and dining room, doing so because (1) Rachel had brought home fire safety information from school; (2) the non-battery operated detector failed to work when tested; and (3) the smoke detectors were on sale at Wal-greens. The only advertisement Shawn saw that related to his purchase of smoke detectors in the spring of 1995 was a Walgreen flier that advertised a sale on First Alert smoke detectors. Shawn selected the detector he purchased because it looked like the basement detector. He spent three to five minutes in the store looking for a round smoke detector. Shawn did not read any of the boxes of the smoke detectors to compare the differences among different types of smoke detectors. Neither before nor after his purchase did he do any investigation into the recommended number of smoke detectors or the best locations for them. He did not read the owner’s manual except to glance at the installation section.
 

 2.
 
 Carbon monoxide detector
 

 In September 1994, Shawn’s parents, Otto and Rosemary Werner, bought a
 
 *1025
 
 First Alert brand carbon monoxide detector for Shawn and his family because Rosemary was concerned about danger from the carbon monoxide produced by the fireplace in the basement. They chose the one they bought because it was on sale. A First Alert brand carbon monoxide detector purchased in September 1994 would have been a FACO model.
 

 Otto and Rosemary Werner did not give the carbon monoxide detector to Shawn until the fall of 1995. It was installed in plaintiffs’ home in November or December 1995. Although Shawn did not test the carbon monoxide detector, Otto pressed the test button and the detector sounded. Shawn was not concerned with the purpose of the carbon monoxide detector and did not rely on the detector to sound an alarm in the case of an unwanted fire in his home. Shawn does not remember seeing any carbon monoxide advertisements before or after his parents gave him the carbon monoxide detector.
 

 OPINION
 

 1. MOTION FOR SUMMARY JUDGMENT
 

 A.
 
 The Parties’ Briefs
 

 ' This is a difficult case because of the sympathetic nature of plaintiffs’ claim and because of the technical claims relating to the alleged defects in the detectors. Those kinds of difficulties are to be expected by judges, but this case is unexpectedly difficult because of the lack of candor displayed by counsel in their briefs. One w’ould think that experienced lawyers prosecuting and defending a high stakes case would be particularly careful about the representations they make to the court. Not so in this case.
 

 Two examples, one from each side, should make the point. At page 11 of plaintiffs’ brief, plaintiffs cite Shawn Wer-ner’s deposition testimony, dkt. # 159, Exh. 9, at 160 for this proposition: “Shawn testified that in the fall of 1995, he replaced the battery in the smoke detector in the basement and tested the detector at this time. The detector sounded an alarm and led Shawn to believe the [basement smoke] detector was operational.” Page 160 of plaintiffs deposition reads in full as follows:
 

 Q Pardon me if I misspoke. When do you recall changing the battery in the smoke detector?
 

 A In the fall of 1985[sic].
 

 Q And what were the circumstances that caused you to change the battery in the basement smoke detector in the fall of 1985[sie]?
 

 A Daylight savings time.
 

 Q So that would have been in October of 1995?
 

 AI believe so.
 

 Q What — did you always change the batteries in the smoke detector when you changed, when the seasons changed — strike that. Did you always change the smoke detector battery when the clock went from daylight savings time to standard time?
 

 A We started to make a point of it.
 

 Q What caused you to make a point of it?
 

 A Rachel would come home with fire safety notices from school and we were becoming more aware of safety issues at our own home.
 

 Q Do you recall what — was that in 1995 then that you did that?
 

 A Yes.
 

 Q Strike that. Was that in 1995 when she came home with the fire safety materials?
 

 P. 161
 

 A Yes.
 

 At a continued deposition, plaintiff was asked again about when he had changed the batteries in the basement smoke detector. After realizing that his daughter had brought home the fire safety material in the spring of 1994, plaintiff revised his testimony to say that the last time he
 
 *1026
 
 really remembered changing the battery was the fall of 1994.
 
 See
 
 p. 184. At p. 185, he was asked whether he had tested the basement smoke detector in the spring of 1995. His answer was, “To be honest with you, I didn’t test it at that time.” The reason he gave was that he had tested it the previous fall when he had changed the battery.
 
 Id.
 

 In short, neither p. 160 nor any other page in Shawn Werner’s deposition supports plaintiffs’ statement that Shawn tested the basement smoke detector in 1995.
 

 For their part, defendants assert in their brief, dkt. # 126, at p. 65, that “Mr. Warner was rescued from the house wearing his sweatpants and little else.” This, they say, supports the proposition that he had been in bed in the master bedroom and had gone down to the basement because he testified at his deposition that his habit was to wear his sweatpants and a robe around the house in the evenings and to wear just his sweatpants to bed.
 
 See
 
 Dep. of Shawn Werner, # 126, Exh. 9, 45-46. As support for what plaintiff was wearing when he was rescued, they.cite the deposition testimony of firefighters Joel Oates and Jay Saterbak as support for this statement. The actual testimony reveals that neither Oates nor Saterbak could say whether Shawn Warner, had clothes on his upper body or not.
 
 See
 
 Dep. of Joel Oates, dkt. #74, at 26-27:
 

 Q Now, let me ask you, once you had Mr. Werner outside and in front of the garage area that we are looking at in Crogan Exhibit No. 8, were you able to determine how he was dressed at that time?
 

 A He was black. White.
 

 Q Did he have a shirt on .his upper torso that you can recall?
 

 A It was black.
 

 Q So you couldn’t tell whether he had a shirt on or not?
 

 A No.
 

 Q How about on the lower portion of his body? Did he have any pants on or anything on that you can remember? A Just black.
 

 See
 
 Dep. of Jay Saterbak, dkt. # 134, at 32:
 

 Q Do you recall whether or not the person that you found at that point was clothed, had clothing on?
 

 A I don’t remember very much clothing. I think it was mostly disrobed.
 

 At 114-15:
 

 Q You said he was — I can’t remember exactly how you described it, but in terms of clothing that he had on you said, essentially, it wasn’t much.
 

 A Yes.
 

 Q Do you have any specific recollection as to items of clothing on his body? A No.
 

 Q Did he have a shirt on?
 

 AI can’t remember.
 

 ' Q Did he have pants on?
 

 AI can’t remember.Q Shoes or socks?
 

 A I don’t believe so. He had either a shirt or pants or shorts or — there was something but not complete.
 

 There is no reference to sweatpants anywhere in the deposition of either firefighter.
 

 B:
 
 Summary Judgment Standard
 

 Summary judgment is appropriate if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.
 
 See
 
 Fed. R.Civ.P. 56(c);
 
 Weicherding v. Riegel,
 
 160 F.3d 1139, 1142 (7th Cir.1998). All evidence and inferences must be viewed in the light most favorable to the non-moving party.
 
 See Anderson v. Liberty Lobby, Inc.,
 
 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the non-movant fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment for the
 
 *1027
 
 moving party is proper.
 
 See Celotex v. Calrett,
 
 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 

 C.
 
 Plaintiffs’ Negligence and, Strict Liability Claims
 

 Plaintiffs contend that defendants are liable under negligence and strict liability theories because 1) they failed to warn consumers of the inherent limitations of First Alert ionization smoke detectors; 2) First Alert ionization smoke detectors are defective products because of their inability to detect smoke from slow, smoldering fire in a timely manner; 3) defendants failed to warn consumers of the inherent limitations of First Alert FACO model carbon monoxide detectors as stand-alone safety devices; and 4) such carbon monoxide detectors are defective products because of their failure to emit an alarm in the presence of dangerous levels of carbon monoxide.
 

 Wisconsin law applies in this diversity action.
 
 See Threshermen’s Mutual Ins. Co. v. Wallingford Mutual Ins. Co.,
 
 26 F.3d 776, 780 (7th Cir.1994) (in diversity suit, federal court applies forum’s law). The elements of a negligence claim are: “(1) A duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and the injury; and (4) an actual loss or damage as a result of the injury.”
 
 Antwaun A. v. Heritage Mutual Insurance Co.,
 
 228 Wis.2d 44, 55, 596 N.W.2d 456, 461 (1999). “The test for negligence is whether the conduct foreseeably creates an unreasonable risk to others.”
 
 Morgan v. Pennsylvania General Insurance Co.,
 
 87 Wis.2d 723, 732, 275 N.W.2d 660 (1979). However, there is no recovery under a negligence theory unless the plaintiff can prove that the defendant’s negligence was a cause of his injuries. Cause is established by showing that the defendant’s negligence was a substantial factor in producing the injury.
 
 See Clark v. Leisure Vehicles, Inc.,
 
 96 Wis.2d 607, 617, 292 N.W.2d 630, 635 (1980).
 

 “Under the theory of strict products liability, a manufacturer is liable for the harm caused by a product to the user or consumer if: (1) the product was in defective condition when it left the possession or control of the seller, (2) it was unreasonably dangerous to the user or consumer, (3) the defect was a cause of the plaintiffs injuries or damages, (4) the seller engaged in the business of selling such product (it was not an isolated transaction unrelated to the principal business of the seller), and (5) the product was one that the seller expected to, and that did, reach the user or consumer without substantial change in the condition it was in when he or she sold it.”
 
 Tanner v. Shoupe,
 
 228 Wis.2d 357, 365-66, 596 N.W.2d 805, 811 (Ct.App.1999) (citing
 
 Dippel v. Sciano,
 
 37 Wis.2d 443, 459-460, 155 N.W.2d 55, 63 (1967) (adopting
 
 Restatement (Second) of Torts
 
 § 402A)); (Wis JT-Civil 3200 (describing all five elements of strict liability claim)). “The standard for causation in strict products liability cases is: ‘whether the defect was a substantial factor in producing the injury.... It need not be the sole factor or the primary factor, only a substantial factor.’”
 
 Tanner,
 
 228 Wis.2d at 368, 596 N.W.2d at 812 (quoting
 
 Sumnicht, v. Toyota Motor Sales U.S.A., Inc.,
 
 121 Wis.2d 338, 358, 360 N.W.2d 2, 11 (1984)).
 

 1.
 
 Causation
 

 a. Bedroom hallway smoke detector
 

 For plaintiffs to succeed on their negligence and strict liability claims relating to the First Alert brand battery-powered ionization smoke detector in the bedroom hallway, they must show the requisite causation. Recovery depends upon showing either that defendants’ negligence was a substantial factor in producing the injury,
 
 see Clark,
 
 96 Wis.2d at 617, 292 N.W.2d at 635, or that the product’s defect was a substantial factor in producing the injury.
 
 See Tanner,
 
 228 Wis.2d at 368, 596 N.W.2d at 812. “The phrase ‘substantial factor’ denotes that
 
 *1028
 
 the defendant’s conduct has such an effect in producing the harm as to lead the trier of fact, as a reasonable person, to regard it as a cause, using that word in the popular sense.”
 
 Merco Distributing Corp. v. Commercial Police Alarm Co.,
 
 84 Wis.2d 455, 458, 267 N.W.2d 652 (1978).
 

 Plaintiffs cannot succeed under either theory because the undisputed facts demonstrate that the hallway smoke detector sounded an alarm. Although there is some dispute about when it sounded, there is no dispute that it sounded in time to give Rachel, Linda and Sarah a sufficient opportunity to escape the fire. After Linda, Sarah and Rachel met in the hallway outside their bedrooms, they walked past the front door and through the kitchen to look for Shawn. After calling to Shawn in the basement, they did not escape from the house through the door that led from the kitchen stair landing to the garage, but proceeded back toward the bedroom area of the house, passing the front door of the house a second time. Not only did Linda, Sarah and Rachel have sufficient time to leave the house, conditions in the house would have allowed them to do so when they were alerted to the fire.
 

 Rachel heard the smoke detector when she was first walking down the hallway.
 
 See Carruth v. Pittway Corp.,
 
 643 So.2d 1340, 1346 (Ala.1994) (“Necessarily, [plaintiff] must show in support of his claim that the detector did not timely sound an alarm; otherwise, there is no causal link between the alleged breach of the duty to adequately warn, and the deaths.”) Because there was still time to escape at that point, the detector did not fail to perform its intended function. Moreover, the fact that Rachel, Linda and Sarah met outside their respective bedrooms without having to awaken each other indicates that it was the smoke detector that woke them. Regardless whether the detector went .off before or after plaintiffs awoke, no reasonable trier of fact could conclude that plaintiffs’ injuries were the result of the hallway smoke detector’s failure to sound a timely alarm, no matter how favorably to plaintiffs their evidence is viewed.
 

 It is understandable that Linda Werner might have wanted to be sure the fire was a real threat before she and her children went outside in their bed clothes in the middle of a January night, but the sad and cautionary fact is that she and Sarah died because she did not get herself and the girls out of the house when she had the chance, not because the hallway smoke detector failed to work properly.
 

 I conclude that as a matter of law, plaintiffs cannot prove that any tortious act or omission on defendants’ part was a substantial cause of the injuries suffered by Linda, Sarah and Rachel. Therefore, I will grant defendants’ motion for summary judgment as to the claims alleged by Linda’s and Sarah’s estates and by Shawn Werner as guardian of Rachel. In the discussion that follows, I will refer only to plaintiff Shawn Werner personally.
 

 b. Basement detectors
 

 In order to prove that a substantial cause of Shawn Werner’s injuries was a design defect in either of the basement detectors (the carbon monoxide detector or the smoke detector), or the lack of adequate warnings about these products, plaintiff has to make a threshold showing that he would not have been injured (or would not have been injured as seriously as he was) had the detectors performed their intended function of sounding an alarm. Obviously, if he was upstairs when the fire broke out and was awakened with his wife and daughters and then chose to go down to the basement for whatever reason, he cannot show that the failure of the basement detectors to sound an alarm was a cause of his injuries. Therefore, he has to show that he was in the basement at the time the fire began, that he would not have noticed the fire and would have been dependent upon the alarms to alert him. Plaintiff has maintained all along that he must have fallen asleep in the basement,
 
 *1029
 
 which is a logical position. Had he been awake, he would not have needed an alarm to warn him that the room was filling with smoke.
 

 On this critical point of his whereabouts when the fire began, plaintiff has cited no evidence that he could adduce at trial to prove it is more probable than not that he was in the basement. The undisputed facts make it equally likely that he was asleep in the master bedroom on the first floor, that he awoke when the hallway alarm sounded and that he went to the basement, perhaps to check the fireplace flue. The fact that the firefighters found him at the landing at the top of the basement stairs does not shed any light on his whereabouts when the fire began, since he would have been trying to escape whether he had been asleep in the basement or had gone down there after the fire broke out.
 

 Despite the fact that it is plaintiffs burden to prove that he was in the basement and dependent on the alarms’ sounding to alert him to the fire, he has not suggested how he would meet that burden. This is the time at which he must do so.
 
 See Celotex Corp.,
 
 477 U.S. at 822, 106 S.Ct. 2548 (“the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party’s case, and on which that party will bear the burden of proof at trial”).
 

 In his brief, plaintiff asserts only two reasons why a jury would be justified in finding that he had been asleep in the basement: his
 
 habit
 
 of falling asleep there and his wife’s decision to call to him there. This is plainly and indisputably insufficient. As to the first reason, plaintiff misstates the evidence. His own proposed fact is that “he would
 
 on occasion
 
 fall asleep in the basement, in front of the TV.”
 
 See
 
 Pltfs.’ Proposed Finding of Fact 85, dkt. # 150. (Emphasis added.) His deposition testimony is that he fell asleep in the basement while watching television approximately once a month,
 
 see
 
 dkt. # 159, Exh. 9, at 40. There is no evidence that he made it a habit to sleep in the basement. Indeed, the evidence is to the contrary: it was his
 
 habit
 
 to sleep with his wife in the master bedroom on the first floor. The second reason adds nothing to plaintiffs showing because his wife’s calling down the basement stairs means only that she thought he was there, not that he was there in fact. Plaintiff would like to have a jury infer from his wife’s attempt to locate him in the basement that she woke up, saw that he was not in the bed with her and knew that he would have fallen asleep in the basement. But that is not the only inference that can be drawn from her conduct. Her attempts to call him could show she thought he was asleep down there; equally, they could show that she thought he had gone down there to check the source of the fire.
 

 Plaintiffs presence on the landing at the top of the basement stairs does not make the doctrine of res ipsa loquitur applicable. In Wisconsin, the doctrine applies only in cases in which 1) either a layperson could determine as a matter of common knowledge or an expert testifies that the result that occurred does not occur ordinarily in the absence of negligence; 2) the agent or instrumentality causing the harm was within the exclusive control of the defendant; and 3) “the evidence offered is sufficient to remove the causation question from the realm of conjecture but not so substantial that it provides a full and complete explanation of the event.”
 
 Peplinski v. Fobe’s Roofing, Inc.,
 
 193 Wis.2d 6, 17, 531 N.W.2d 597 (1995) (quoting
 
 Lecander v. Billmeyer, 171
 
 Wis.2d 593, 601-02, 492 N.W.2d 167, 170-71 (1992)). Plaintiff cannot make the first showing because his injuries could have occurred without any tortious act or omission by defendants. His injuries might be the result of his decision to head down to the basement to locate the source of the fire rather than escaping
 
 from
 
 it or, if he had been asleep in the basement, from having decided to
 
 *1030
 
 put out the fire when he was awakened by the detectors, rather than leaving, the basement immediately. Unfortunately, it is not unusual for people to make the mistake of trying to put out a fire before realizing that it is beyond them.
 

 The point is that plaintiff can only speculate about his whereabouts when the fire started. Speculation will not get him to the jury. He must adduce proof sufficient to allow the court to determine that a reasonable jury could find it more probable than not that he was in the basement and that he was asleep when the fire broke out.
 
 See
 
 Fed.R.Civ.P. 50(a)(1) (“If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense ... ”)
 
 See also Merco Distributing Corp. v. Commercial Police Alarm Co.,
 
 84 Wis.2d 455, 460, 267 N.W.2d 652, 655 (1978) (when there is no credible evidence upon which trier of fact can base a reasoned choice between two possible inferences, “any finding of causation would be in the realm of speculation and conjecture”) (citing
 
 Rodenkirch v. Johnson,
 
 9 Wis.2d 245, 248, 101 N.W.2d 83 (1960)); Prosser,
 
 Law of Torts
 
 241 (4th ed. 1971) (“A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.”).
 

 The parties have undertaken exhaustive discovery. Plaintiff has the depositions of the neighbor who discovered the fire, the firefighters and his own daughter, as well as numerous experts. Despite all this discovery, he still does not know where he was on January 27, 1996, when the fire broke out in his home. Without that crucial information or information tending to show that it was more likely than not that he was asleep in the basement, he cannot prevail on his claim that his injuries were caused by the failure of the basement detectors to sound an alarm. If it is just as likely that he was asleep upstairs when the fire began, any failure of the basement detectors is irrelevant. Plaintiff would have been awakened with his family and would have had adequate time to leave the house.
 

 Although plaintiffs failure to adduce evidence to show that he could create a true jury issue on his whereabouts is dispositive of this motion, plaintiffs case is weak on other fronts as well. Plaintiffs claims concerning the basement smoke detector rest on his contention that battery-operated ionization smoke detectors are not adequate to warn sleeping residents of slow, smoldering house fires. Making out his claims requires him to show not only that he was asleep in the basement but that the smoke detector was in place in the basement at the time of the fire, that it contained working batteries, that it was an ionization model, that it did not sound an alarm, that ionization models are inherently inadequate protection for slow, smoldering fires such as the one in his residence and that defendants’ First Alert product was known to be unreliable because of problems such as corrosion. Defendants dispute plaintiffs ability to make any of these showings.
 

 Because all the detectors have disappeared, it is not possible to know whether there was a smoke detector in place in plaintiffs basement. Plaintiff has no photograph of a basement smoke detector, either before or after the fire. However, the former owner has testified that he installed one before he sold the house to plaintiff, although he does not know the type. Plaintiff does not have a clear memory of the last time he installed fresh batteries. As noted, he testified first that it was fall of 1995, then changed his testimony upon reflection to say that the last time he had changed the batteries was in the fall of 1994. There is no evidence that
 
 *1031
 
 he tested the detector after the fall of 1994.
 

 Plaintiff does not know what sensing unit the basement smoke detector used. His sole evidence that the basement detector was an ionization detector is the expert testimony of B. Don Russell, a professor of electrical engineering. In ¶ 7 of his second affidavit, Russell states
 

 Based on the testimony of Shawn Wer-ner and the affidavit of Don Hopkins, the smoke detector in the basement of the Werner home was most probably a First Alert battery operated ionization smoke detector. The most significant evidence on this issue is the testimony of Shawn Werner in which he describes the words, “First Alert,” being molded or embossed into the plastic cover; that the battery was replaced by opening the cover; that the cover hinged; and that the cover would not close with the battery removed. This description is consistent with this detector being an ionization smoke detector and not a photoelectric.
 

 (Internal citations omitted.)
 

 In
 
 Daubert v. Merrell Dow Pharmaceuticals, Inc.,
 
 509 U.S. 579, 583, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that Fed.R.Evid. 702 imposes a special obligation upon a trial judge to “ensure that any and all scientific testimony ... is not only relevant, but reliable.” In
 
 Kumho Tire Co., Ltd. v. Carmichael, 526 U.S.
 
 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999), the Supreme Court extended
 
 Daubert,
 
 holding that the trial judge’s gatekeeping obligation “applies not only to testimony based on ‘scientific’ knowledge, but also to testimony based on ‘technical’ and ‘other specialized’ knowledge.” Courts in the Seventh Circuit employ a two-step inquiry for evaluating the admissibility of expert testimony under Fed.R.Evid. 702.
 
 See Ancho v. Pentek,
 
 157 F.3d 512, 515 (7th Cir.1998) (citing
 
 Wintz v. Northrop Corp.,
 
 110 F.3d 508, 512 (7th Cir.1997)). First, they examine the expert’s testimony to determine whether it is scientifically reliable; if it is, they determine whether the testimony would assist the trier of fact (that is, whether the evidence is relevant).
 
 See Kirstein v. Parks Corp.,
 
 159 F.3d 1065, 1067 (7th Cir.1998) (citing
 
 Cummins v. Lyle Industries,
 
 93 F.3d 362 (7th Cir. 1996)). In determining scientific reliability and validity, the critical question is whether the alleged expert employed scientifically reliable and valid methods.
 
 See Ancho,
 
 157 F.3d at 515. At its essence, science
 
 is
 
 methods. As with scientific inquiry itself, the court’s focus is on the process rather than on the results; as long as the methods are sound, the scientist and the court do not pass judgment on the results.
 
 See People Who Care v. Rockford Bd. of Educ.,
 
 111 F.3d 528, 537 (7th Cir.1997). Courts “must rule out subjective belief or unsupported speculation.”
 
 Ancho,
 
 157 F.3d at 515.
 

 Russell’s conclusion that the basement detector was an ionization detector is based on the affidavit of the previous owner of plaintiffs’ house (Hopkins) and on the deposition testimony of plaintiff Shawn Werner. In If 4 of his affidavit, Hopkins avers that “The smoke detector that I installed was round and white in color. The detector also required one 9-volt battery for operation.” Shawn discusses in his deposition the presence of the words “First Alert” on the detector’s plastic cover, how the battery was replaced as well as the cover of the detector.
 
 See
 
 Dep. of Shawn Werner, dkt. # 159, Exh. D at 149-56. From that testimony, Russell concludes that the “smoke detector in the basement of the Werner home was most probably a First Alert battery operated ionization smoke detector.”
 

 Although Russell has an extensive background in electrical engineering, he has failed to describe the methodology or supporting data he used to reach his conclusion that the basement detector was an ionization detector. It is not enough merely to state that he knows this because the
 
 *1032
 
 detector said First Alert and because the battery was replaced by opening a hinged cover. Russell has not explained why these characteristics would be determinative in distinguishing an ionization detector from some other kind and if so, how he came to have this knowledge. Rather, he has offered “only a bare conclusion.... ‘An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.’ ”
 
 McMahon v. Bunn-O-Matic Corp.
 
 150 F.3d 651, 658 (7th Cir. 1998) (quoting
 
 Mid-State Fertilizer Co. v. Exchange Nat’l Bank,
 
 877 F.2d 1333, 1339 (7th Cir.1989));
 
 Huey v. United Parcel Service, Inc.,
 
 165 F.3d 1084, 1087 (7th Cir.1999) (“[The expert] may have specialized knowledge or skills, but he did not apply them to the analysis of [plaintiffs] claim.”) In order to testify that plaintiffs’ basement smoke detector was an ionization model, Russell would have to demonstrate that he has a scientific basis for his identification of the detector.
 

 Because the detector is gone and plaintiff cannot analyze it for any defect peculiar to that particular detector, plaintiff has focused his claim on the allegation that the design problems of the First Alert battery-operated ionization smoke detectors reduce their ability to detect smoke from slow smoldering fires, making them unreasonably dangerous. I do not understand plaintiff to be contending that defendants are obligated to market only the most sensitive, highest quality smoke detector, only that they are obligated to assure that all smoke detectors provide a timely alarm to allow for a safe escape from the common types of household fires.
 

 There is no precedent in Wisconsin involving the failure of smoke detectors to emit a timely alarm, but courts in other jurisdictions have found in similar cases that “it is foreseeable that a person could be hurt if a smoke detector fails to give notice for all to exit the house or if the warning is delayed because of a defect in the detector.”
 
 Dillard v. Pittway Corp.,
 
 719 So.2d 188, 192 (Ala.1998);
 
 see also Weatherbee v. Gustafson,
 
 64 Wash.App. 128, 822 P.2d 1257 (1992) (summary judgment not granted, because of factual dispute whether failure of smoke alarm to sound was proximate cause of injuries). In a decision that is not binding on this court but is persuasive, the Court of Appeals for the Second Circuit held that plaintiffs “are entitled to have an opportunity to show that the alleged failure of the smoke detector to sound a timely alarm exposed them to an unreasonably dangerous condition, and that their damages are attributable to this alleged failure.”
 
 Butler v. Pittway Corp.,
 
 770 F.2d 7, 10, 12 (2d Cir.1985) (applying New York law) (“Although the smoke detectors in [plaintiffs’] home did not cause the fire, had they sounded a timely alarm the fire may have been detected earlier and the alleged resulting damages and injuries may have been less severe.”)
 

 Plaintiffs argument fails because he cannot prove his claim that battery-operated ionization detectors are defective and inherently dangerous. His claim rests on the theory that such detectors cannot detect fires of the kind that destroyed plaintiffs residence in time to alert residents, but the undisputed evidence is that the battery-operated ionization detector in plaintiffs bedroom hallway sounded during exactly the same fire and provided plaintiffs family adequate time to escape.
 

 Plaintiff suggests that his expert witness would offer evidence about the tendency of some horns on “83R design” detectors to malfunction because of corrosion. Such evidence would be irrelevant because plaintiff has no evidence that the detector in his basement suffered from this particular defect.
 

 .c. Basement carbon monoxide detector
 

 Plaintiffs claims relating to this detector are barred by his inability to show that he was in the basement when the fire started so as to make the performance of this detector relevant to the injuries he suffered. In addition, it is questionable
 
 *1033
 
 whether he could prove any defect of design or warning in the carbon monoxide detector in his basement.
 

 In his complaint, plaintiff alleged that there was a First Alert brand FAGO model carbon monoxide detector in their basement at the time of the fire. This allegation is supported by the fact that plaintiffs parents purchased a carbon monoxide detector in September 1994, which they gave to plaintiffs in fall of 1995. It is undisputed that a detector bought in September 1994 would have been a FACO model. As a result, all discovery in this case focused on First Alert FACO carbon monoxide detectors. It appears now, however, that the carbon monoxide detector in plaintiffs’ home may have been the later-produced NICO model rather than a FACO. Current and former employees of defendant BRK have reviewed a photograph of the detector from plaintiffs’ basement taken after the fire and testified in depositions that although FACO units had black sensor packs, the detector’s sensor in the picture did not appear to be black. (The detector has not been seen since the fire and there is no pre-fire picture of it.) Instead, the sensor pack appears to be white, indicating that the carbon monoxide detector was a NICO model.
 

 Although neither side proposed as fact the possibility that the carbon monoxide detector might be a NICO and not a FACO model, it appears that there is a question as to which type was in plaintiffs’ basement at the time of the fire. Unless plaintiff can prove that it is a FACO, he cannot withstand a motion for judgment as a matter of law, because he has no evidence of any defects in the NICO model. In any event, the question is moot.
 

 C.
 
 Fraudulent Advertising
 

 Plaintiffs’ fraudulent advertising claims fall with plaintiffs’ inability to prove causation, but I will discuss them for the sake of completeness. Plaintiffs contend that defendants marketed their smoke and carbon monoxide detectors in violation of Wis. Stat. § 100.18, which prohibits the making of false statements in connection with the sale of goods and services. Section 100.18(ll)(b)2 creates a private cause of action for any person who has experienced a “pecuniary loss” resulting from any violation of § 100.18. Plaintiffs contend that defendants violated § 100.18 by failing to disclose the carbon monoxide detector’s limited useful life, its failure to function in low humidity conditions and its unreliability in sounding a timely alarm in the presence of carbon monoxide. Plaintiffs also contend that defendants violated § 100.18 by failing to disclose that ionization detectors are not suitable stand-alone safety devices and that ionization detectors fail to emit an alarm in response to common household fires in time for safe escape. Defendants argue that they are entitled to summary judgment because plaintiffs’ claims under § 100.18(ll)(b)2 are time-barred and because the requisite causal link between the supposedly misleading statements and plaintiffs’ losses is missing.
 

 As explained in the order entered August 18, 1999, if plaintiffs’ claims are to survive the three-year period of limitation established by § 100.18(ll)(b)3, plaintiffs must show that defendants engaged in a continuing course of misconduct and that one of their acts fell inside the three years prior to filing of this lawsuit. To do so, plaintiffs must demonstrate that they received one of defendants’ allegedly misleading statements sometime during the five-day period between January 22, 1996 (three years before the filing of this lawsuit) and January 26, 1996 (the day of the fire) so as to fall within the “continuing tort” theory. This is essential in order to establish a “causal link” between the misleading statements and their injuries.
 
 See Tim Torres Enterprises v. Linscott,
 
 142 Wis.2d 56, 69, 416 N.W.2d 670, 675 (Ct. App.1987) (“We interpret [§ 100.18(1 l)(b)2j as requiring a causal connection between the practices found illegal and the pecuniary losses suffered.”). Not only have plaintiffs failed to show that
 
 *1034
 
 they reUed upon a misleading statement within the relevant five-day period, they have no evidence that they relied on statements from defendants at any time. Therefore, I need not decide whether the alleged misrepresentations in defendants’ advertisements are untrue in fact;
 

 Plaintiffs did not rely on any statements from defendants regarding the carbon monoxide detector. Plaintiff Shawn Werner received it as a gift, did not rely on the detector to sound an alarm in the case of an unwanted fire in his home and does not remember seeing any carbon monoxide advertisements before or after his parents gave him the detector. When he purchased the smoke detector for the hallway in the spring of 1995, he selected the First Alert ionization detector because it looked like the one in his basement. Shawn did not read the boxes of the smoke detectors he purchased or the owner’s manuals, with the exception of the installation section. The only advertisement Shawn saw that could have influenced his decision was a Walgreen flier advertising a sale on First Alert smoke detectors. Plaintiffs’ argument that they relied on misrepresentations made by defendants with regard to the basement smoke detector is disingenuous because Shawn did not purchase that detector and more important, did not even know what type of smoke detector it was. In fact, plaintiffs admit that “neither Shawn Werner nor his parents, Otto and Rosemary, saw a specific untrue statement about any detector during the time period of January 22-January 26, 1996.” Pltfs.’ Br., dkt. # 148, at 33. Accordingly, summary judgment would have to be granted for defendants on this claim, even if plaintiffs could have established causation.
 

 II. MOTION FOR SANCTIONS
 

 Defendants have moved to dismiss plaintiffs’ case for spoliation of evidence because of plaintiffs’ inability to produce the smoke and carbon monoxide detectors. Because I am granting defendants’ motion for summary judgment, it is not necessary to reach this issue. I will note, however, that defendants have adduced no evidence of “a conscious attempt to affect the outcome of litigation or a flagrant knowing disregard of the judicial process,”
 
 Garfoot v. Fireman’s Fund Ins. Co.,
 
 228 Wis.2d 707, 724, 599 N.W.2d 411, 416 (Ct.App. 1999), that would justify the sanction of dismissal. There is no evidence that plaintiffs requested that the detectors be disposed of. Plaintiffs did not have a lawyer until May 1996, after the detectors had been disposed of, and Shawn was in and out of consciousness until April 1996.
 

 ORDER
 

 IT IS ORDERED that the motion of defendants Pittway Corporation and BRK Brands, Inc. for summary judgment is GRANTED with respect to all claims of plaintiffs Shawn D. Werner, personally and as guardian of Rachel Werner, Terry L. Werner, as personal representative of the Estate of Linda S. Werner and as the special administrator of the Estate of Sarah A. Werner. Defendants’ motion for sanctions attributable to spoliation is DENIED as moot. The clerk of court is directed to enter judgment for defendants and to close this case.